No. 24-1255

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

PUBLIC INTEREST LEGAL FOUNDATION
*Plaintiff-Appellant*,

v.

JOCELYN BENSON, in her official capacity
as Michigan Secretary of State,
*Defendant-Appellee*,

and

ELECTRONIC REGISTRATION INFORMATION CENTER, INC.
*Movant-Appellee*.

---

Appeal from the United States District Court
for the Western District of Michigan
The Honorable Jane M. Beckering, Presiding
Case No. 1:21-cv-929

---

## BRIEF OF *AMICUS CURIAE*
## RESTORING INTEGRITY AND TRUST IN ELECTIONS
## (RITE) SUPPORTING REVERSAL

---

Benjamin M. Flowers
 *Counsel of Record*
Andrew D. McCartney
ASHBROOK BYRNE KRESGE LLC
PO Box 8248
Cincinnati, Ohio 45249
(513) 201-5775
bflowers@ashbrookbk.com

*Counsel for Amicus Curiae Restoring
Integrity and Trust in Elections*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: __24-1255__          Case Name: __PILF v. Benson__

Name of counsel: __Benjamin M. Flowers__

Pursuant to 6th Cir. R. 26.1, __Restoring Integrity and Trust in Elections, Inc.__
                                                    *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ June 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ __Benjamin M. Flowers__

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES...........................................................................iii

STATEMENT OF *AMICUS* INTEREST .............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

ARGUMENT .......................................................................................... 4

I.   The NVRA's reasonable-effort requirement mandates reasonable efforts to remove *all* deceased voters from the voter rolls. ............................................. 4

   A.   The NVRA's statutory text requires that States engage in a reasonable effort to remove all ineligible voters from their voter rolls. ......................... 4

   B.   The legislative history bolsters the conclusion that the reasonable-effort requirement has teeth. ....................................................................... 8

      1.   Provisions aimed at ensuring list maintenance were a key part of the legislative compromise that led to the NVRA's enactment. .................. 8

      2.   The legislative history shows that the NVRA was passed with the goal of making States use a comprehensive program to maintain accurate, continuously updated voter rolls...........................................................13

II.  The District Court improperly weakened the NVRA's list-maintenance requirements. ...................................................................................15

   A.   The use of "reasonably reliable information" does not satisfy the NVRA's reasonable-effort requirement....................................................................15

   B.   The District Court invented a "reasonableness" standard that is even more relaxed than the Eleventh Circuit's standard. ........................................... 18

CONCLUSION .................................................................................... 22

CERTIFICATE OF COMPLIANCE .......................................................... 23

CERTIFICATE OF SERVICE .................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bellitto v. Snipes*,
    935 F.3d 1192 (11th Cir. 2019) ...................................................... 16, 17

*McCray v. United States*,
    195 U.S. 27 (1904) ................................................................................ 20

*Tapia v. United States*,
    564 U.S. 319 (2011) ............................................................................... 8

*Yovino v. Rizo*,
    586 U.S. 181 (2019) (*per curiam*) ......................................................... 1

**Statutes**

52 U.S.C. §20501(b) ........................................................ 2, 4, 5, 6, 13, 20

52 U.S.C. §20507(a) .............................................. 2, 3, 5, 6, 7, 14, 20, 21

52 U.S.C. §20507(c) ........................................................................... 6

52 U.S.C. §20507(i) ...................................................... 6, 7, 17, 20, 21, 22

52 U.S.C. §20511(2) ........................................................................ 5, 7

National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat.
    77 (1993) (codified as amended at 52 U.S.C. §§20501−11) ............................. 1, 9

**Other Authorities**

137 Cong. Rec. S2067-02 (Jan. 23, 1991) ................................................ 9

139 Cong. Rec. D100-01, 1993 WL 27305 (Feb. 4, 1993) ........................... 9

139 Cong. Rec. D236-02, 1993 WL 75733 (Mar. 17, 1993) ...................... 10

139 Cong. Rec. D462-01, 1993 WL 143112 (May 5, 1993) ....................... 11

139 Cong. Rec. D491-02, 1993 WL 151746 (May 11, 1993) ......................................11

139 Cong. Rec. D555-01, 1993 WL 169637 (May 20, 1993) ....................................11

139 Cong. Rec. H1823-01, 1993 WL 96000 (Apr. 1, 1993)....................................... 10

139 Cong. Rec. H2257-02, 1993 WL 143001 (May 5, 1993)................................... 12

139 Cong. Rec. H2264-03, 1993 WL 143004 (May 5, 1993) .........................10, 11, 12

139 Cong. Rec. H505-02, 1993 WL 27166 (Feb. 4, 1993). ....................................... 9

139 Cong. Rec. S2389-02, 1993 WL 56970 (Mar. 4, 1993) ..................................... 9

139 Cong. Rec. S5677-04, 1993 WL 147095 (May 7, 1993) ...................................... 9

139 Cong. Rec. S5744-01, 1993 WL 151572 (May 11, 1993). ................................... 12

139 Cong. Rec. S5746-03, 1993 WL 151575 (May 11, 1993) ............................... 12, 13

Fed. R. App. P. 29(a)(2) ....................................................................................... 1

H.R. 2, 103rd Cong. (1st Sess. 1993) ...................................................................... 9

H.R. 2190, 101st Cong. (2d Sess. 1990)................................................................. 8

H.R. Conf. Rep. No. 103-66 (Apr. 28, 1993) ...............................................................11

H.R. Rep. No. 103-9 (Feb. 2, 1993) ................................................................ 8, 10, 13

S. 250, 102d Cong. (1st Sess. 1991) ...................................................................... 8

S. 874, 101st Cong. (2d Sess. 1990) ..................................................................... 8

S. Rep. No. 103-6 (Feb. 25, 1993).................................................. 9, 10, 14, 15, 17, 22

## STATEMENT OF *AMICUS* INTEREST

RITE's interest in this case stems from its mission to ensure that our "[e]lectoral systems" are "designed, safeguarded, and implemented in a manner that reflects the will of our citizens so that electoral results enjoy the public's full faith and confidence." *Our Mission*, Restoring Integrity and Trust in Elections, https://riteusa.org/our-mission/ (as last visited June 3, 2024). The issue in this case—the nature of the States' duty to maintain accurate and current voter registration rolls under the National Voter Registration Act—bears directly on that mission

All parties consented to the filing of this brief, and RITE files it under Rule 29(a)(2) of the Federal Rules of Appellate Procedure.[*]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Not long ago, the Supreme Court observed that Article III tenure lasts "for life, not for eternity." *Yovino v. Rizo*, 586 U.S. 181, 186 (2019) (*per curiam*). The same is true of an individual's right to vote—when an American dies, his right to vote dies with him.

Even though dead Michiganders have no right to vote, about 27,000 are still registered to do so. *See* Opening Brief of Public Interest Legal Foundation ("PILF Br.") at 5–6. That poses a problem under the National Voter Registration Act of 1993, or the "NVRA." Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified as amended at 52 U.S.C. §§20501–11). The NVRA aims to "ensure that accurate and current voter

---

[*] No party's counsel authored this brief in whole or in part. Nor did any person or entity other than the *amicus curiae* or its counsel contribute money intended to fund this brief's preparation or submission.

registration rolls are maintained." 52 U.S.C. §20501(b)(4). Indeed, the legislative history establishes that the NVRA would never have been enacted had Congress not included provisions requiring States to maintain accurate, up-to-date voter rolls. The NVRA accomplished this, in part, by requiring that States "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" who have died or changed residence. §20507(a)(4). An effort that results in 27,000 dead voters remaining on the rolls is not likely to be reasonable—and there is a genuine dispute regarding whether Michigan's efforts were in fact reasonable.

Nevertheless, the District Court held that Michigan's efforts satisfied the NVRA as a matter of law. Op., R.180, PageID# 3658. To reach its holding, the court relied on an Eleventh Circuit decision that watered down the NVRA's command to the point of drowning it. According to that decision, it makes no difference how well States perform in identifying and removing ineligible voters; as long as they use "reasonably reliable information" in conducting list-maintenance efforts, they fulfill their legal obligation under the reasonable-effort provision. *Id.*, PageID#3657 (quoting *Bellitto v. Snipes*, 935 F.3d 1192, 1205 (11th Cir. 2019)). Perhaps sensing the inadequacy of this test, the District Court offered several observations that, in its view, showed that Michigan's list-maintenance procedures satisfied the District Court's own sense of reasonableness. In making these observations, the court suggested that States satisfy the reasonable-effort requirement by allowing dead voters to remain registered in numbers that are lower than some undefined threshold, by relying on multiple data sources (regardless of whether those sources produce accurate results), or by performing less inadequately than other States. *Id.*, PageID#3655, 3657.

The District Court erred, and this Court should reverse. The District Court's decision contradicts the NVRA's text, *see below* 4–7, 15–22. A "reasonable effort to remove the names of ineligible voters" who are ineligible because of "death," §20507(a)(4)(A), requires a reasonable effort to remove the names of *all* deceased voters. Whether a State made a reasonable effort to do so entails a holistic inquiry into the State's program. This holistic inquiry requires that courts consider which data States use, how often they use it, and how they use it to identify and remove deceased voters. Thus, data quality is an important aspect of the equation. But it is just one part of the equation. And reliability, the District Court's sole focus, is merely one aspect of data quality. While it is *necessary* for States to use reliable data, it is not sufficient. States must also use data sets that are reasonably comprehensive—data sets with known gaps will not suffice, regardless of how reliably they identify deceased voters that the data captures. Further, whatever data the State relies upon, the State must use the data in a manner reasonably calculated to identifying and removing the names of deceased voters; to hold otherwise would allow States to satisfy the NVRA by using reliable information in connection with procedures carried out very infrequently by dramatically understaffed, under-resourced departments using outdated technology (or no technology at all). If that is "reasonable," then the reasonable-effort provision is toothless.

In addition to contradicting the NVRA's text, the District Court's decision disrespects the legislative compromise that led to the NVRA's enactment. The bill passed only because early supporters agreed to amendments that addressed election-integrity concerns. *See below* 8–15. The enacted version of the law expressly codifies

the law's goal of "ensur[ing] that accurate and current voter registration rolls are maintained." §20501(b)(4). The reasonable-effort provision serves that goal. Weaking that provision by deeming it satisfied whenever the State uses "reliable" data—without regard to the comprehensiveness of that data, how it is used, or how often list-maintenance efforts are undertaken—thwarts that goal and the political compromise it reflects.

At bottom, the question of reasonableness is a fact-intensive inquiry. Because the District Court failed to even engage in the proper inquiry when it awarded summary judgment to the State, this Court should reverse.

## ARGUMENT

### I.    The NVRA's reasonable-effort requirement mandates reasonable efforts to remove *all* deceased voters from the voter rolls.

The NVRA's list-maintenance requirement uses the phrase "reasonable effort." But that raises the question: Reasonable effort *to do what*? The text of the NVRA answers that question. It requires that States make a reasonable effort to promptly remove *all* deceased voters from their rolls. That text reflects hard-won political compromises necessary to secure the NVRA's enactment.

#### A.    The NVRA's statutory text requires that States engage in a reasonable effort to remove all ineligible voters from their voter rolls.

The NVRA includes four stated purposes. *First*, it aims "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." §20501(b)(1). *Second*, the NVRA seeks "to make it possible for Federal, State, and local governments to implement this chapter in a manner that

enhances the participation of eligible citizens as voters in elections for Federal office." §20501(b)(2). *Third*, the NVRA is supposed "to protect the integrity of the electoral process." §20501(b)(3). *Finally*, the NVRA serves the goal of "ensur[ing] that accurate and current voter registration rolls are maintained." §20501(b)(4).

Two of these four stated purposes are geared toward increasing voter registration and voter participation. §20501(b)(1)–(2). But the other two are directed to "protect[ing] the integrity of the electoral process," including by "*ensur[ing]* that accurate and current voter registration rolls are maintained." §20501(b)(3)–(4) (emphasis added). The Act even goes so far as to impose criminal penalties on anyone who knowingly and willfully "attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process" through either fraudulent voter-registration applications or fraudulent ballots. §20511(2).

Any proper interpretation of the NVRA must account for these twin, sometimes competing purposes; courts must read the Act in a way that promotes both voter participation and election integrity.

This case turns primarily on provisions aimed at the second purpose. To "ensure that accurate and current voter registration rolls are maintained," §20501(b)(4), the NVRA requires States to engage in list-maintenance efforts, §20507(a)(4). Specifically, it says that "each State *shall* … conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—(A) the death of the registrant; or (B) a change in the residence of the registrant[.]" *Id.* (emphasis added).

The law thus requires a reasonable effort to accomplish a goal. And what is that

goal? "[R]emov[ing] the names of" voters who have died or changed their residence. *Id.* The statute's aim is thus the removal of the names of these individuals; not some of the names, but all of them. Other provisions of the NVRA require the same. For example, the Act requires States to retain "all records concerning the implementation of programs and activities conducted for the purpose of *ensuring the accuracy and currency* of official lists of eligible voters." §20507(i)(1) (emphasis added). Because an "accura[te] and curren[t]" list includes no ineligible voters, this provision further supports the conclusion that the State's reasonable efforts must be directed to the goal of removing all ineligible voters. Reasonable efforts to accomplish anything less are insufficient.

To be sure, States must make only a "reasonable effort"—the NVRA does not mandate perfection. But the reasonableness of any effort must be assessed in light of the goal of timely removing every deceased voter's name. No doubt, there is more than one way to "ensure that accurate and current voter registration rolls are maintained." §20501(b)(4); *see also* §20507(c). For that reason, the NVRA does not provide an exhaustive list of exactly what procedures each State must follow to keep their voter rolls "accurate and current." §20501(b)(4). Instead, the NVRA leaves States with latitude. But in exercising that latitude, States must make efforts reasonably directed at identifying all voters who are ineligible by reason of death.

In sum, the NVRA works to ensure—not "reasonably accurate," not "mostly accurate," not "comparatively accurate"—but "*accurate and current* voter registration rolls." *Id.* (emphasis added). It does so by requiring States to implement a "program that makes a reasonable effort to," among other things, remove the names of all

deceased voters from the voter rolls. §20507(a)(4). The NVRA helps States in this effort on the front end by establishing criminal penalties for those who would attempt to inflate voter rolls with the names of ineligible persons. §20511(2)(A). And on the back end, the NVRA charges the States with taking reasonable efforts to keep their rolls accurate and current. *See* §§20507(a)(4), 20507(i). The NVRA treats the States' discharge of this responsibility as exceptionally important—so important that it requires States to keep records of their efforts for at least two years, thereby allowing those efforts to be audited. §20507(i).

This reasonable-effort requirement, just like any other "reasonableness" inquiry, *see* PILF Br.22-25, demands a fact-intensive inquiry. To know whether a State has made "reasonable" efforts to identify and remove deceased voters, one must consider the reliability of the data the State uses. But one must also consider the data's comprehensiveness. After all, States do not reasonably endeavor to identify and remove deceased voters unless they use comprehensive data that reliably identifies such voters—it is not "reasonable" to use unreliable data, or data that is reliable but incomplete. And in assessing the comprehensiveness and reliability of a data set, courts must consider the accuracy, cost, and improvement that would result from alternative data sources that the State could use in addition to or in place of the data it actually uses. Why? Because it is not "reasonable" to ignore accurate data that could, for little or no cost, be used instead of or in addition to the data actually used. Finally, the State must use the data in a manner reasonably calculated to identifying and removing deceased voters; no matter how good the data is, efforts to use it are not "reasonable" if they are implemented in unreliable ways or only infrequently.

### B. The legislative history bolsters the conclusion that the reasonable-effort requirement has teeth.

For "those who consider legislative history useful," *Tapia v. United States*, 564 U.S. 319, 331 (2011), the history of the NVRA's enactment bolsters the foregoing interpretation of the reasonable-effort provision. And even for those who do not consider legislative history useful as an interpretive tool, the history here will still help explain the NVRA's focus on election integrity. The history shows that, had the NVRA not contained provisions protecting election integrity, it never would have passed. That history is consistent with the fact-intensive inquiry for which this brief advocates in connection with the reasonable-effort requirement. It is consistent, in other words, with reading the reasonable-effort requirement to have teeth.

### 1. Provisions aimed at ensuring list maintenance were a key part of the legislative compromise that led to the NVRA's enactment.

*a.* Begin with a brief overview of the NVRA's history, which makes the more-detailed description of the law's enactment easier to understand.

An early version of the legislation passed the House of Representatives on a bipartisan basis. *See* H.R. Rep. No. 103-9, at 4 (Feb. 2, 1993); H.R. 2190, 101st Cong. (2d Sess. 1990), www.congress.gov/bill/101st-congress/house-bill/2190. That bill, which contained no "reasonable effort" language, died in the Senate after receiving no Republican support. *See* H.R. 2190, 101st Cong. (2d Sess. 1990); S. 874, 101st Cong. (2d Sess. 1990), www.congress.gov/bill/101st-congress/senate-bill/874. The next year, Senator Wendell Ford from Kentucky tried again, introducing what came to be known as "S. 250." *See* S. 250, 102d Cong. (1st Sess. 1991), www.congress.gov/bill/102nd-congress/senate-bill/250. This time, Senator Hatfield (a

Republican) joined Senator Ford in introducing the bill—a bill that, as Senator Ford emphasized in his introduction, included the "reasonable effort" language for list-maintenance. 137 Cong. Rec. S2067-02, S2117 (Jan. 23, 1991), www.congress.gov/bound-congressional-record/1991/01/23/senate-section. This bill made it through both houses. But President H.W. Bush vetoed it. 139 Cong. Rec. H505-02, H521, 1993 WL 27166 (Feb. 4, 1993). In his veto message, President Bush called S. 250 "an open invitation to fraud and corruption." *Id.* (statement of Rep. Dornan). The Senate tried, but failed, to override the veto. *Id.*

Congress returned to the drawing board. The House introduced "H.R. 2," which passed as amended one month later. 139 Cong. Rec. D100-01, D101, 1993 WL 27305 (Feb. 4, 1993); *see also* H.R. 2, 103rd Cong. (1st Sess. 1993), www.congress.gov/bill/103rd-congress/house-bill/2. Around the same time, the Senate considered S. 460, which was "essentially the same as H.R. 2," *see* 139 Cong. Rec. S2389-02, S2389, 1993 WL 56970 (Mar. 4, 1993) (statement of Sen. Ford), and also similar to H.R. 2's "companion bill," which Senator Hatfield and Senator Ford introduced in the Senate. *Id.* H.R. 2 passed the Senate in lieu of that companion bill. *See* S. Rep. No. 103-6, at 4 (Feb. 25, 1993); H.R. 2, 103rd Cong. (as passed by Senate, Mar. 17, 1993). And after President Clinton signed H.R. 2, the bill became the law we know today as the NVRA Pub. L. No. 103-31, 107 Stat. 77 (1993).

*b.* That brief history elides just how much rigorous debate, compromise, and amendments shaped the NVRA. The final version resulted from years of "hard negotiations." 139 Cong. Rec. S5677-04, S5678, 1993 WL 147095 (May 7, 1993) (statement of Sen. Wellstone).

Many who opposed H.R. 2—the bill that became the NVRA—raised concerns about risks the bill posed to election integrity, including inaccurate voter rolls. H.R. Rep. No. 103-9, at 35 (minority views on H.R. 2). To alleviate these concerns, Senate committee members "worked to improve its provisions related to protection of the electoral process from registration fraud." S. Rep. No. 103-6, at 58 (additional views of Sen. Hatfield). Similarly, committee members "worked to mandate an address verification system which ma[d]e[] a 'reasonable' attempt to clean the voting rolls, as well as provisions to allow states to require mail registrants to vote in person the first time." *Id.*

"Perhaps the greatest concern raised regarding H.R. 2 [was] the potential risk of fraud through mail registration and *lax list-cleaning procedures*." 139 Cong. Rec. H2264-03, H2273, 1993 WL 143004 (May 5, 1993) (statement of Rep. Morella) (emphasis added). After amended H.R. 2 passed the House over strenuous objection from the minority, "Republican Senators were able to force the majority to compromise." *Id.* at H2265 (statement of Rep. Livingston).

At this point, the Senate insisted on amendments to H.R. 2 and requested a conference with the House. 139 Cong. Rec. D236-02, D236, 1993 WL 75733 (Mar. 17, 1993). The joint conference report addressed many of the minority's concerns. Even Representative Livingston, an adamant opponent of the bill, acknowledged that the Senate's amendments "tremendously improved" it. 139 Cong. Rec. H1823-01, H1825, 1993 WL 96000 (Apr. 1, 1993). In a further example of compromise, Senator Ford—the leading sponsor of the bill in the Senate—championed the amendments aimed at bringing opponents around. *Id.* at H1823.

The conferees accepted eleven of thirteen Senate amendments with "little or no change in their technical language." 139 Cong. Rec. H2264-03, H2265, 1993 WL 143004 (May 5, 1993) (statement of Rep. Rose). The eleven adopted amendments went a long way to protecting against inaccurately inflated voter rolls. Among other things, these amendments (1) provided that failing to sign the voter-registration portion of an application counts as declining to apply for registration; (2) required that the voter-registration application form include the penalties for submitting a false application; and (3) provided that States could in some cases remove from the rolls the names of voters whose notice of approval is returned undelivered. H.R. Conf. Rep. No. 103-66, at 17–18 (Apr. 28, 1993).

In the end, "th[e] conference report maintain[ed] and protect[ed] the integrity of [the] election process." 139 Cong. Rec. H2264-03, H2273, 1993 WL 143004 (May 5, 1993) (statement of Rep. Morella). Of most relevance here, it included "requirements to remove from the voting rolls *the names of those who have died* or moved out of the jurisdiction." *Id.* (emphasis added). In addition, it included other provisions aimed at election integrity. These included "several elements to protect against registration by those who are not eligible to vote because they are not U.S. citizens," along with provisions imposing "strong criminal penalties for fraud." *Id.*

After debating the conference report, the House agreed to it. 139 Cong. Rec. D462-01, D462, 1993 WL 143112 (May 5, 1993). Several days later, the Senate agreed to the report. 139 Cong. Rec. D491-02, D491, 1993 WL 151746 (May 11, 1993). In late May 1993, the final version of H.R. 2 was presented to and signed by President Clinton. 139 Cong. Rec. D555-01, 1993 WL 169637 (May 20, 1993).

Senator Bob Dole summed up the process well: "We have made a number of changes that have made this bill a better piece of legislation, and it is largely due to the efforts of the distinguished Senator from Kentucky" (referring to Senator Mitch McConnell). 139 Cong. Rec. S5744-01, S5745, 1993 WL 151572 (May 11, 1993). According to Senator Dole, the changes made in the joint conference "made it possible to pass the bill." *Id.*

Others in the House and Senate echoed Senator Dole's thoughts. Representative Frost called the conference report "a compromise worthy of the democratic process." 139 Cong. Rec. H2257-02, H2257, 1993 WL 143001 (May 5, 1993). Even Representative Livingston—an opponent, remember—admitted that, "[t]hrough extended debate the minority was able to improve the bill by forcing the majority to compromise, a practice rarely seen in the 103d Congress." 139 Cong. Rec. H2264-03, H2265, 1993 WL 143004 (May 5, 1993).

The compromise that produced the NVRA came about largely because of the dueling forces of Senator Ford (the leading sponsor of the bill in the Senate), and Senator McConnell (who strongly opposed every iteration of it). Senator Durenberger, a swing vote, thanked Senator Ford "for his leadership to promote universal access to voter registration," and Senator McConnell "for his firm commitment to preserving the integrity of the election process." 139 Cong. Rec. S5746-03, S5747, 1993 WL 151575 (May 11, 1993); *see also* 139 Cong. Rec. S5744-01, S5745, 1993 WL 151572 (May 11, 1993) (Sen. Dole stating that Sen. Durenberger "was able to support cloture [on the day the bill passed in the Senate] because of changes that were made in the conference"). According to Senator Durenberger, it was "the involvement of

these two Senators from different political parties from [Kentucky] that made it possible for the … bill to accomplish both of their objectives." 139 Cong. Rec. S5746-03, S5747, 1993 WL 151575 (May 11, 1993).

The NVRA is thus a prime example of the political process producing a compromise that balances potentially competing goals—in this case, "increas[ing] the number of eligible citizens who register to vote" and "ensur[ing] that accurate and current voter registration rolls are maintained." §20501(b)(1), (4). As Senator Durenberger stated, "the lesson" is that the Senate's "tradition of unlimited debate can serve as a powerful tool to promote consensus-building and dialog between the parties." 139 Cong. Rec. S5746-03, S5747, 1993 WL 151575 (May 11, 1993).

> **2.**   **The legislative history shows that the NVRA was passed with the goal of making States use a comprehensive program to maintain accurate, continuously updated voter rolls.**

*a.* In light of the carefully brokered compromise that produced the NVRA, it is not surprising that ensuring accurate voter rolls remained a central goal throughout legislative deliberations. In the words of the Committee on House Administration, to which H.R. 2 was referred: "Ensuring that expanding the opportunities to register would *in no way weaken the validity of the registration rolls* was a priority for the Committee. The Committee felt strongly that no legislative provision should be considered that did not at least maintain the current level of fraud prevention." H.R. Rep. No. 103-9, at 5 (emphasis added). Similarly, the Senate Committee on Rules and Administration stated: "Recognizing *the essential need to maintain the integrity of the voter registration lists*, the bill requires that States conduct a general program that makes a reasonable effort to remove the names of ineligible voters" who have died or changed

13

residence. S. Rep. No. 103-6, at 31 (emphasis added) (considering a nearly identical version of H.R. 2). The same report recognized "the concern of the Committee that each State should develop mechanisms to ensure the integrity of the voting rolls," *id*. at 13, and stressed that "each registration program" that the bill called for had "been developed to assure the integrity of the voting rolls," *id*. at 30.

Legislators repeatedly lauded "[t]he maintenance of accurate and up-to-date voter registration lists" as "the hallmark of a national system seeking to prevent voter fraud." *Id*. at 18; *see also id*. at 31 ("The [Senate] Committee believes that accurate and current voter registration lists are essential to the integrity of the election process and for the protection of the individual."). Similarly, legislators consistently affirmed that "[a]n important goal of [the NVRA], to open the registration process, must be balanced with the need to maintain the integrity of the election process by updating the voting rolls on a continual basis." *Id*. at 18.

These statements held water. Several provisions of the NVRA are expressly intended to work together to ensure accurate voter rolls. Of perhaps most relevance here, the NVRA's "reasonable effort" requirement mandates that States work to remove deceased voters from their rolls. Again, the NVRA requires that "each State shall … conduct a general program that makes a reasonable effort to remove the names of" deceased voters "from the official lists of eligible voters." §20507(a)(4). The Senate report discussed above stresses that this provision "*requires* States to conduct a program" that "*maintain[s]* the integrity of the rolls." S. Rep. No. 103-6, at 18 (emphases added). That program must be "general *and comprehensive*." *Id*. at 32 (emphasis added). And it must "updat[e] the voting rolls on a *continual* basis." *Id*. at 18

14

(emphasis added); *see also id.* at 20 ("[U]pdating registration rolls is an ongoing and continuous process."). Simply put, legislators understood a "reasonable effort" as demanding a sustained, genuine effort to keep deceased and out-of-state voters off the voter rolls. Repeatedly, the expectation was that States would maintain "accurate" lists. *See, e.g., id.*, at 31–32, 42.

Even skeptics of legislative history would concede that the NVRA would not have passed without its election-integrity provisions. Those provisions include the reasonable-effort provision. Reading that provision in the manner this brief advocates respects that compromise, ensuring that the NVRA's promotion of voter participation does not free the States to undertake insufficient efforts to remove deceased voters from the rolls.

## II.    The District Court improperly weakened the NVRA's list-maintenance requirements.

In awarding summary judgment to Michigan, the District Court relied on the Eleventh Circuit's "reasonably reliable information" standard—a test that is at war with the NVRA's text. The District Court also offered some additional observations unrelated to the Eleventh Circuit's test. None, however, fills the chasm between the Eleventh Circuit's error and the demands of the NVRA, because none addresses the many relevant considerations that inform the fact-intensive question whether a State has made reasonable efforts to remove deceased voters from its rolls.

### A.    The use of "reasonably reliable information" does not satisfy the NVRA's reasonable-effort requirement.

In holding that Michigan made the statutorily required "reasonable effort" to identify and remove dead voters from the rolls, the District Court relied heavily on

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019). *See* Op., R.180, PageID#3656-57, 3659. Specifically, the District Court embraced *Bellitto*'s holding that States necessarily satisfy the reasonable-effort requirement, in its application to deceased voters, whenever they "use reasonably reliable information to identify and remove" those voters. 935 F.3d at 1205. Under this reasonably-reliable-information test, "reliance on reliable death records, such as state health department records and the Social Security Death Index, to identify and remove deceased voters constitutes a reasonable effort." *Id.* And the use of this data constitutes a reasonable effort *without regard* to whether there are other, more complete data sources available for identifying deceased voters. Relying on this reasonably-reliable-data test, the District Court held that Michigan complies with the NVRA as a matter of law because it "relies on [the Social Security Death Index] and state health records in order to identify and remove deceased registrants." Op., R.180, PageID#3659.

*Bellitto* was wrongly decided, and so too was the decision below. *Bellitto* lost sight of the goal with respect to which States must make a reasonable effort. Again, the NVRA does not require that States make a "reasonable effort" to identify and remove some undefined percentage or number of deceased voters. Instead, it requires that States make a "reasonable effort" to identify and remove deceased voters—all of them. *See above* 4–7. The use of "reasonably reliable information" is necessary to any such effort. But it is not sufficient. To illustrate why, imagine a list-maintenance program based on data that very accurately records all deaths from cancer. That data would be reliable. But it would also be enormously incomplete. To hold that States could satisfy the reasonable-effort requirement by relying on such data would sap the

requirement of all force.

Contrary to the Eleventh Circuit, States must use data that is both reliable *and* comprehensive. Further, States must use that data in a manner reasonably calculated to serve the NVRA's goal of identifying and removing deceased voters from the rolls. *That* is what is needed to "ensur[e] the accuracy and currency of official lists of eligible voters." §20507(i)(1) (emphasis added); *see also* S. Rep. No. 103-6, at 32. To illustrate the point with an extreme hypothetical, a State would not make reasonable efforts to identify and remove these names if it tasked a single individual with manually checking the voter rolls against millions of entries of deceased citizens once every five years. In sum, a State's efforts to remove the names of deceased voters are "reasonable" only if those efforts are undertaken using data that is both reliable and comprehensive. And what the State does with the data must also be reasonable. This requires assessing the frequency and rigorousness of the State's list-maintenance efforts, including by taking into account the availability, accuracy, and cost of alternative data sources and data-analysis procedures.

The Eleventh Circuit evaded these points by appealing to a straw man. It noted that States need not "exhaust all available methods for identifying deceased voters." *Bellitto*, 935 F.3d 1205. True enough, but there is an immense gap between requiring States to exhaust all available methods and permitting States to satisfy their reasonable-effort duties by relying on non-comprehensive data, making use of methods ill-suited to their supposed ends, and doing so only infrequently.

The District Court did not conduct the fact- and context-dependent inquiry that the reasonable-effort test demands. Instead, relying on *Bellitto*, it determined that

17

Michigan necessarily complied with the NVRA by using reliable information. Its failure to conduct the proper legal inquiry is reason enough to reverse its award of summary judgment.

**B.    The District Court invented a "reasonableness" standard that is even more relaxed than the Eleventh Circuit's standard.**

Perhaps sensing that the Eleventh Circuit's test is flawed, the District Court supported its holding with a series of additional observations. None, however, establishes that Michigan engaged in the reasonable efforts the NVRA requires.

*First*, the District Court thought it reasonable for Michigan to have 27,000 dead voters on its rolls. It stressed that "the 27,000 'potentially deceased' voters that PILF identifies would comprise approximately 0.3 percent of the total number of registered voters in Michigan." Op., R.180, PageID#3657. "Even if all the voters on PILF's list were *actually* deceased," the court said, "that number of deceased voters would *simply not be unreasonable* in a state the size of Michigan." *Id.* (second emphasis added).

This analysis is flawed. For one thing, the District Court focused too heavily on the number of apparent errors. To be sure, the number of apparent errors may be *relevant* to the reasonable-effort analysis; a large number of such errors (in absolute terms) is suggestive of a broken, and thus unreasonable, list-maintenance process. But as addressed above, the ultimate question is whether the State is reasonably using reliable and comprehensive data. The number of errors provides a baseline against which to judge the reasonableness of the State's efforts, because it provides a comparator for assessing alternative or additional methods of list maintenance available

to the State. But the number of errors cannot establish the reasonableness of the State's declining to implement those alternative or additional methods. Nor does it shed much light on the frequency or rigorousness of the State's efforts. Without considering all these issues, it is impossible to say whether the State's efforts are reasonable.

What is more, the reasoning the District Court offered is little more than *ipse dixit*. The court divided the number of potential errors by the number of registered voters and declared the resulting percentage (0.3 percent) acceptable. *See* Op., R.180, PageID#3657. But the court never justifies its chosen denominator. Why look at the number of registered voters? Those numbers will be inflated in any State with poor list-maintenance efforts, which means using this denominator benefits most the States who do the least to maintain accurate rolls. Why not instead divide the number of potential misses (27,000) by the number of deceased voters actually removed over some defined period? Were that to yield a high percentage, that would indicate that the State's list-maintenance processes do not reasonably use reliable and comprehensive data. If the District Court's chosen denominator can be justified, that justification appears nowhere in the court's opinion.

Relatedly, the opinion baldly asserts that 0.3 percent is low enough to "not be unreasonable" in a "state the size of Michigan." *Id*. It never defends that claim, and it offers no baseline against which to assess that conclusion. Indeed, it is impossible to read the opinion and come away with any idea of what might constitute an unreasonable number of deceased voters on the rolls in a State of Michigan's size. It cannot be that NVRA cases turn on judges' gut feelings about which error rates are too small

to matter.

Indeed, nothing in the NVRA permits this inquiry into whether the outcome of the State's list-maintenance efforts satisfies a judge's personal sense of reasonableness. That is because the NVRA does not impose a "reasonableness" standard untethered from any goal. To the contrary, the NVRA directs States to make a reasonable effort to identify deceased voters so as to "ensure that accurate and current voter registration rolls are maintained." §20501(b)(4); *see also* §20507(i)(1). An accurate and current voter-registration list includes zero deceased voters. Thus, the NVRA makes zero the acceptable number of deceased-yet-registered voters. While States are not likely to timely identify and remove from the rolls every deceased voter, they must make a "reasonable effort" to do so. §20507(a)(4). The District Court's reasoning runs counter to this. It seemingly embraced the view that some undefined amount of non-compliance with the NVRA's goal, unmoored from any discernable baseline, is acceptable, and that States (perhaps necessarily, perhaps presumptively) satisfy the reasonable-effort requirement unless the number of deceased-yet-registered voters exceeds some undefined threshold. As the Supreme Court once said in another context, this constitutes "not an interpretation of the statute, but a disregard of its … provisions." *McCray v. United States*, 195 U.S. 27, 48 (1904).

*Second*, the District Court lauded Michigan's "multilateral process" for identifying and removing deceased voters. *See* Op., R.180, PageID#3641, 3659. It seemingly believed that Michigan's use of a "multilateral process" supports finding a "reasonable effort" *without regard* to the process's effectiveness in identifying deceased voters. *Id.*, PageID#3659. That inverts the NVRA's requirements, which are concerned

with the quality, not the quantity, of list-maintenance processes. Again, States must "ensur[e] the accuracy and currency of official lists of eligible voters." §20507(i)(1). Part of that process involves making "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of … death of the registrant." §20507(a)(4)(A). While the number of processes used may bear on the reasonableness of the State's efforts, the quality and frequency of the processes used are far more important; a State would not make a reasonable effort to identify and remove deceased voters if it used a multilateral process not reasonably calculated to accurately identifying these voters.

*Third*, the District Court defined "reasonable effort" based on comparisons to other States. The Court leaned heavily on the fact that "Michigan is consistently among the most active states in cancelling the registrations of deceased individuals." Op., R.180, PageID#3643. And the Court praised Michigan for being in the top six States (over the last four recent election cycles) when it comes to canceling deceased voters' registrations. *Id.*, PageID#3655. But the NVRA does not grade on a curve. How a State performs in comparison to others may be *evidence* that the State's efforts are reasonable. But it cannot be dispositive. Again, "reasonable effort" is context dependent. Courts must independently assess the list-maintenance program's inputs, the process by which those inputs are used, and the frequency with which they are used. If a well-performing State is coming up short of the NVRA's goals, courts must consider the reasons for that deficiency. Perhaps its data-matching procedures are substandard. Perhaps its resourcing is unreasonable. Or perhaps it just is not operating the program frequently enough. Whatever the reason may be, if a well-performing

State declines to pursue reasonably available methods that would more accurately "maintain the integrity of the rolls," S. Rep. No. 103-6, at 18; *see also* §20507(i)(1), the fact that other States are doing even worse is no excuse.

*    *    *

When Congress passed the NVRA, it hoped to protect election integrity by promoting accurate and current voter-registration lists. To promote this goal, Congress required that States make a "reasonable effort" to identify and remove deceased voters from the rolls. This language is best read to mandate that States make a reasonable effort to remove every such name. And that fact-intensive inquiry requires asking whether the State made reasonable use of reliable and comprehensive data. The District Court's decision did not hold Michigan to this standard. And on that basis, it entered summary judgment for the State. This Court should reverse.

## CONCLUSION

The Court should reverse the District Court's judgment.

June 3, 2024

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers
 *Counsel of Record*
Andrew D. McCartney
ASHBROOK BYRNE KRESGE LLC
PO Box 8248
Cincinnati, Ohio 45249
(513) 201-5775
bflowers@ashbrookbk.com

*Counsel for Amicus Curiae Restoring Integrity and Trust in Elections*

**CERTIFICATE OF COMPLIANCE**

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements and contains 5,992 words. *See* Fed. R. App. P. 29(a)(5), 32(a)(7).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers

## CERTIFICATE OF SERVICE

I certify that on June 3, 2024, I filed this brief electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance. Parties may access this filing through the Court's system.

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers