No. 24-01255

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

PUBLIC INTEREST LEGAL FOUNDATION,
*Plaintiff-Appellant*,

v.

JOCELYN BENSON, in her official capacity
as Michigan Secretary of State,
*Defendant-Appellee.*

ELECTRONIC REGISTRATION INFORMATION CENTER, INC.,
*Movant-Appellee.*

On Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:21-cv-00929 (Beckering, J.)

BRIEF OF *AMICUS CURIAE*
REPUBLICAN NATIONAL COMMITTEE
IN SUPPORT OF APPELLANT

Thomas R. McCarthy
Tiffany H. Bates
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
tiffany@consovoymccarthy.com
conor@consovoymccarthy.com

June 4, 2024

*Counsel for Amicus Curiae Republican National Committee*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-1255            Case Name: Public Interest Legal Found. v. Benson

Name of counsel: Thomas McCarthy

Pursuant to 6th Cir. R. 26.1, Republican National Committee
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

### CERTIFICATE OF SERVICE

I certify that on _____ June 4, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Thomas McCarthy

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................................... i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF AMICUS CURIAE ............................................................ 1

INTRODUCTION ........................................................................................ 2

ARGUMENT ............................................................................................... 3

I.   Accurate voter rolls are essential to the integrity and reliability of Michigan's elections. ...................................................................................... 3

II.  Litigation is the only method available to enforce the NVRA. ............... 5

A.   The Justice Department has sued numerous jurisdictions for failing to implement reasonable list-maintenance procedures. ..................................... 6

B.   Private parties have successfully sued numerous other jurisdictions for failing to employ reasonable list-maintenance efforts. ............................... 10

III. Ineffective list maintenance thwarts the purposes of the NVRA. ...................... 14

CONCLUSION ......................................................................................... 16

CERTIFICATE OF COMPLIANCE ........................................................ 18

CERTIFICATE OF SERVICE ................................................................. 18

# TABLE OF AUTHORITIES

## Cases

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ................................................................................2, 5

*Crawford v. Marion Cty. Election Bd.*,
553 U.S. 181 (2008) ............................................................................ 2, 3, 5

*Daunt v. Benson*,
No. 1:20-cv-522 (W.D. Mich. 2020) ...............................................12

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018) ..............................................................................10

*Intra-Cellular Therapies, Inc. v. Iancu*,
938 F.3d 1371 (Fed. Cir. 2019) ..........................................................14

*Judicial Watch, Inc. v. Husted*,
No. 2:12-cv-792 (S.D. Ohio 2012) ....................................................11

*Judicial Watch, Inc. v. King*,
No. 1:12-cv-800 (S.D. Ind. 2012) ......................................................11

*League of Women Voters of Wis. Educ. Network, Inc. v. Walker*,
2014 WI 97 (2014) ...................................................................................4

*Pub. Interest Legal Found. v. Winfrey*,
No. 2:19-cv-13638 (E.D. Mich. 2019) .............................................12

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ......................................................................................5

*Republican Nat'l Comm. v. Aguilar*,
No. 2:24-cv-518 (D. Nev. 2024) .........................................................13

*Republican Nat'l Comm. v. Benson*,
No. 1:24-cv-262 (W.D. Mich. 2024) .................................................13

*Suter v. Artist M.*,
503 U.S. 347 (1992) ................................................................................14

*United States v. Bd. of Election Comm'rs for St. Louis*,
No. 4:02-cv-1235 (E.D. Mo. 2002) ......................................................7

*United States v. Indiana*,
No. 1:06-cv-1000 (S.D. Ind. 2006) ......................................................9

*United States v. Louisiana,*
No. 3:11-cv-470 (M.D. La. 2011) .................................................................. 10

*United States v. Maine,*
No. 1:06-cv-86 (D. Me. 2006) ........................................................................ 10

*United States v. Missouri,*
535 F.3d 844 (8th Cir. 2008) .......................................................................2, 8

*United States v. Missouri,*
No. 2:05-cv-4391 (W.D. Mo. 2005) ................................................................. 8

*United States v. New Jersey,*
No. 2:06-cv-4889 (D.N.J. 2006) .................................................................... 10

*United States v. Pulaski Cty.,*
Doc. 1, No. 4:04-cv-389 (E.D. Ark. 2004) ...................................................... 8

*Voting Rts. Coal. v. Wilson,*
60 F.3d 1411 (9th Cir. 1995) ........................................................................... 6

## Statutes

35 U.S.C. §154 ..................................................................................................... 14

42 U.S.C. §671 ..................................................................................................... 13

52 U.S.C. §20501 ..............................................................................................2, 14

52 U.S.C. §20507 ..............................................................................................8, 13

52 U.S.C. §20510 ..............................................................................................2, 6

## Other Authorities

136 Cong. Rec. 1243 (1990) ................................................................................ 18

Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections
(Sept. 2005) (Carter-Baker Report) ...................................................3, 5, 6, 13

Pew Ctr. on the States, *Inaccurate, Costly, and Inefficient: Evidence that America's Voter
Registration System Needs an Upgrade* (2012), perma.cc/RV7S-LLKX ........... 12

Royce Crocker, *The National Voter Registration Act of 1993: History, Implementation, and
Effects,* Congressional Research Serv. (Sept. 18, 2013), perma.cc/4SQT-GSRK ....6, 7

U.S. Comm'n on Civil Rights, *Department of Justice Voting Rights Enforcement for the
2008 U.S. Presidential Election* (2009), perma.cc/GJW6-QJ4C .................................4, 11

U.S. Comm'n on Civil Rights, *Voter Fraud and Voter Intimidation* (2008),
perma.cc/Z4RS-595S ........................................................................................ 5

## INTEREST OF AMICUS CURIAE

The Republican National Committee is a national political party committee and the national political organization of the Republican Party of the United States. The RNC represents the interests of Republican voters and candidates at all levels throughout the nation, and it engages in a wide range of party-building activities, including voter registration, persuasion, and turnout programs. The RNC also works to elect Republican candidates to state and federal office. In November 2024, its candidates will appear on the ballot in Michigan for numerous federal and state offices.

The RNC has vital interests in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in Michigan elections and elsewhere. To protect these interests, the RNC works to ensure that States are maintaining accurate and clean voter rolls. When States such as Michigan refuse to follow the NVRA, the RNC has filed lawsuits to hold them accountable. It thus has a serious interest in this case. Michigan's failure to comply with the NVRA's voter-list maintenance obligations undermines the integrity of elections by increasing the opportunity for ineligible voters or voters intent on fraud to cast ballots.

The RNC files under Federal Rule of Appellate Procedure 29(a)(2).[1] All parties consent to the filing of this brief.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* or her counsel made any monetary contribution intended to fund the preparation or submission of this brief. The parties have consented to its filing.

**INTRODUCTION**

Congress enacted the National Voter Registration Act partly to ensure that States maintain accurate voter registration rolls. Accurate rolls foster confidence in the electoral process and promote efficiency in election administration. Inaccurate rolls undermine that confidence and invite fraudulent or ineligible votes. All three branches of the federal government have recognized these obvious consequences. Congress did so in the NVRA itself. *See* 52 U.S.C. §20501(b)(3)-(4). The Supreme Court has recognized these consequences repeatedly. *E.g.*, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 193-94 (2008). And the Justice Department has sued States that violate the NVRA by failing to maintain their rolls. *E.g.*, *United States v. Missouri*, 535 F.3d 844 (8th Cir. 2008).

Indeed, litigation is the principal enforcement mechanism of the NVRA. The Justice Department has brought numerous suits against States, cities, and counties for deficient list-maintenance practices. Most of those cases ended in consent decrees in which the defendants agreed to lengthy lists of specific list-maintenance practices. Congress knew that the Justice Department's resources are limited, so it had the foresight to include a private right of action in the NVRA. *See* 52 U.S.C. §20510(b). Sure enough, after prevailing in several lawsuits, the Justice Department passed the baton to private parties to continue enforcement of the NVRA's list-maintenance provisions. Those efforts have also been successful, largely resulting in similar settlements against

2

States that fail to conduct reasonable list-maintenance programs. But the effort is ongoing, as States such as Michigan continue to shirk their duties under the NVRA.

The district court's judgment undermines Congress's purposes in enacting the NVRA. It turns Congress's reasonable-efforts standard into an any-effort-is-enough standard. But reviewing driver's lists instead of voter lists cannot be reasonable *voter list* maintenance. *See* Blue Br. at 34. And when the State permits tens of thousands of deceased voters to remain on the rolls for years, there is at least a genuine dispute as to whether the defendants' efforts are reasonable. The district court erred in granting summary judgment to the defendants, and this Court should reverse.

## ARGUMENT

I.    **Accurate voter rolls are essential to the integrity and reliability of Michigan's elections.**

As the Supreme Court has recognized, "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud." *Crawford*, 553 U.S. at 193-94 (opinion of Stevens, J.) (quoting Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections §2.5 (Sept. 2005) (Carter-Baker Report)). Voter-list maintenance programs are an important tool in deterring fraud. Bloated rolls "create[] a potential for people to fraudulently vote under the names of [] illegally registered individuals." U.S. Comm'n on Civil Rights, *Department of Justice Voting Rights Enforcement for the 2008 U.S. Presidential Election* 12 (2009), perma.cc/GJW6-QJ4C. Confirming voters' identities requires "[a] good registration list [to] ensure that citizens are only

3

registered in one place." *Crawford*, 553 U.S. at 193-94. And, as courts around the country have recognized, "[t]he electoral system cannot inspire public confidence if no safeguards exist ... to confirm the identity of voters." *League of Women Voters of Wis. Educ. Network, Inc. v. Walker*, 2014 WI 97, ¶52 (2014).

Voter registration is the first line of defense for free and fair elections. In 2008, the U.S. Commission on Civil Rights published a report on Voter Fraud and Voter Intimidation that made detailed findings about national registration practices. The Commission found that "the growing use of unofficial third-party voter registration drives has led to a rise in reports of voter registration fraud, especially fraud committed by those who have been paid by the piece to register voters." U.S. Comm'n on Civil Rights, *Voter Fraud and Voter Intimidation* 16 (2008), perma.cc/Z4RS-595S. Those and other practices theoretically may provide "greater voter access," but they have also "posed difficulties" such as "verifying voter identity." *Id.* Those difficulties make list maintenance even more critical—and more challenging. "Among the difficulties faced by election officials is the fact that the pool of qualified voters is constantly changing, with almost 40 million people moving each year. As a result, many jurisdictions have flawed or outdated voter rolls." *Id.*

Aside from voter fraud, bloated voter rolls invite all kinds of ineligible voting—intentional, accidental, and innocent—all of which harm public confidence in elections. And the link between poor registration efforts and ineligible votes has been observed by the Carter-Baker Commission, a well-respected bipartisan authority relied on by the

Supreme Court. *E.g.*, *Brnovich*, 594 U.S. at 685-86; *Crawford*, 553 U.S. at 193-94, 197. According to the Carter-Baker Commission, "registration lists lie at the root of most problems encountered in U.S. elections." Carter-Baker Report, *supra*, at 10. Inaccurate voter rolls that contain "ineligible, duplicate, fictional, or deceased voters" invite "fraud." *Id.* Although voter fraud is often difficult to detect, "the risk of voter fraud [is] real," and can "affect the outcome of a close election." *Crawford*, 553 U.S. at 196; *see also* *Brnovich*, 594 U.S. at 672. And regardless of whether fraud is detected, "the perception of possible fraud contributes to low confidence in the system." Carter-Baker Report, *supra*, at 18.

The Supreme Court agrees. "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197. "Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). By letting Michigan shirk its duty to maintain accurate voter rolls, the district court's decision gravely undermines these critical values.

## II.     Litigation is the only method available to enforce the NVRA.

"Implementation" of the NVRA "is, and has always been, the sole responsibility of each state." Royce Crocker, *The National Voter Registration Act of 1993: History, Implementation, and Effects* 10, Congressional Research Serv. (Sept. 18, 2013), perma.cc/4SQT-GSRK. Neither Congress nor any federal agency has "further legal

authority under the act." *Id.* Bu Congress understood that merely requiring list maintenance would not ensure that States actually conducted list maintenance. So Congress included judicial enforcement mechanisms in the NVRA to ensure compliance. The Justice Department can "bring a civil action in an appropriate district court" to obtain "declaratory or injunctive relief" for violations of the NVRA. 52 U.S.C. §20510(a). And because elections require public confidence, Congress permitted any "person who is aggrieved by a violation" of the NVRA to "bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." *Id.* §20510(b). And Congress encouraged private lawsuits by allowing courts to award "reasonable attorney fees, including litigation expenses, and costs" to prevailing private parties. *Id.* §20510(c).

### A.    The Justice Department has sued numerous jurisdictions for failing to implement reasonable list-maintenance procedures.

These litigation tools have been necessary to ensure compliance with the NVRA. By 1994, only 23 States had complied with the law. *See* Crocker, *supra*, at 19. California outright refused to comply. But the Ninth Circuit rejected its constitutional arguments and ordered the State to implement the NVRA. *See Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1416 (9th Cir. 1995). The Justice Department also obtained favorable judgments or settlements against Illinois, Pennsylvania, Montana, Texas, and Louisiana. *See* Crocker, *supra*, at 19-20. Even after these efforts, many jurisdictions were still falling short in their list-maintenance practices a decade after Congress passed the NVRA.

So the Justice Department ramped up enforcement efforts against States and counties for deficient list maintenance. In 2002, the Department sued the city of St. Louis, Missouri, for failing to comply with the NVRA's list-maintenance requirements. *See United States v. Bd. of Election Comm'rs for St. Louis*, Doc. 1, No. 4:02-cv-1235 (E.D. Mo. 2002). Among other problems, the city had for over six years failed to notify voters that their status had been changed to inactive. *See id.*, Doc. 4. The city's poor voter-roll maintenance led to severe problems during the November 2000 election, resulting in flooded phone lines and long queues at registration offices. *See id.*

The parties quickly settled, and the court signed a consent decree requiring city officials to take a number of corrective steps. Those steps included mailing change-of-residence notices before the next federal election and conducting a "media strategy designed to encourage city residents" to verify and update their registration status. *Id.* at 9-10. The city officials also agreed to appoint election judges throughout the city who would ensure that voters who showed up to vote on election day were properly registered. *Id.* at 12-15. The election judges would require varying degrees of information from voters depending on their registration status. For example, an inactive voter could vote only after completing an affidavit, and a voter who did not appear on the rolls at all could vote only by provisional ballot. *Id.* at 13-15. The consent decree also contained a list of obligations that the NVRA itself "does not require." *Id.* at 18. Those obligations included, for example, "providing laptop computers and printing in

every voting precinct" for the election judges' use and allocating sufficient funds for training. *Id.* at 17.

The Justice Department next sued Pulaski County, Arkansas, alleging county election officials violated the NVRA by failing to conduct reasonable list maintenance. *See United States v. Pulaski Cty.*, Doc. 1, No. 4:04-cv-389 (E.D. Ark. 2004). As in St. Louis, the parties entered a consent decree requiring county election officials to conduct specific list-maintenance practices. *Id.*, Doc. 9. Those mandatory practices included mailing address confirmations to "active voters for whom there is reason to believe there has been a change of address," *id.* at 4-6, as well as conducting media campaigns and posting public notices "to encourage county residents to verify their address of record in the voter registration database" in the weeks immediately preceding the next federal election, *id.* at 9-10. County officials also agreed to election-day procedures requiring election judges to ensure that each person who votes appears on the list of registered active voters. *Id.* at 10-13.

The Justice Department returned to Missouri in 2004, alleging that the entire State had violated the NVRA. *See United States v. Missouri*, Doc. 1, No. 2:05-cv-4391 (W.D. Mo. 2005). This time, the parties did not settle, and the case proceeded through discovery. The district court ruled for Missouri on summary judgment after concluding that the State could not be held accountable for the list-maintenance failures of local election agencies. *See* Doc. 103 at 23-26.

The Eighth Circuit reversed. It held that "the district court misunderstood the relevance of the [local election agencies'] actions or inactions regarding Missouri's compliance with the NVRA." *Missouri*, 535 F.3d at 851. That is, the lack of compliance by local election agencies is "relevant to determining whether or not Missouri is reasonably 'conduct[ing] a general program.'" *Id.* (quoting 52 U.S.C. §20507(a)(4)). And although the district court could not order the State "to *enforce* the NVRA against the [local election agencies]," it could order "[o]ther remedies," such as requiring Missouri to "develop different or improved methods for encouraging [local election agencies'] compliance," or to "assume direct responsibility for some or all of the activities needed to remove ineligible voters from the voter rolls." *Id.* The court left the proper remedy for the district court to determine on remand. *Id.* But the district court never reached that phase, because the United States voluntarily dismissed the case in 2009. *See* Docs. 139, 140, No. 2:05-cv-4391.

Indiana was next. In 2006, the Justice Department filed a complaint alleging that Indiana was failing to perform reasonable list maintenance under the NVRA. *See United States v. Indiana*, Doc. 1, No. 1:06-cv-1000 (S.D. Ind. 2006). Like the cases against St. Louis and Pulaski County, this case quickly settled. The parties entered a consent decree that contained many similar terms as the other consent decrees. *See id.*, Doc. 4. This one also included specific obligations pertaining to deceased voters. The consent decree required the State to "distribute notices" within three days "regarding the more than 29,000 registrants who may be deceased and 290,000 registrations which may be

duplicates … to each county voter registration office for appropriate action." *Id.* at 3. The State would then require each county "to make a determination … on these potentially invalid registrations" before the next election. *Id.*

The Justice Department filed similar complaints against New Jersey and Maine. *See United States v. New Jersey*, Doc. 1, No. 2:06-cv-4889 (D.N.J. 2006); *United States v. Maine*, Doc. 1, No. 1:06-cv-86 (D. Me. 2006). Both ended in quick, similar consent decrees. Then, after the 2008 election, the Justice Department "sent letters to a dozen states inquiring about their list maintenance practices" because "there appeared to be significant imbalances between their numbers of registered voters and their citizen populations." *Voting Rights Enforcement for the 2008 U.S. Presidential Election*, *supra*, at 38. The Justice Department then switched its focus to other requirements of the NVRA, such as registration opportunities at public assistance agencies and programs for disabled voters. *See, e.g.*, *United States v. Louisiana*, Doc. 1, No. 3:11-cv-470 (M.D. La. 2011). Where the Justice Department left off, private parties took over.

> **B. Private parties have successfully sued numerous other jurisdictions for failing to employ reasonable list-maintenance efforts.**

Despite the efforts of the Justice Department, many States still employed deficient list-maintenance procedures. In 2012, the Pew Center conducted an extensive study of nationwide voter records. It concluded that 24 million voter registrations (at the time, one out of every eight) were invalid or inaccurate. For example, 2.75 million people were registered to vote in more than one state. *See* Pew Ctr. on the States,

*Inaccurate, Costly, and Inefficient: Evidence that America's Voter Registration System Needs an Upgrade* (2012), perma.cc/RV7S-LLKX; *accord Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 760 (2018). "Inflated voter lists are also caused by phony registrations and efforts to register individuals who are ineligible." Carter-Baker Report, *supra*, §2.5.

In an attempt to hold States accountable to Congress's requirements, private parties have also filed lawsuits under the NVRA's private right of action. Six years after the Justice Department sued Indiana, the State still suffered from bloated rolls. Judicial Watch sued Indiana in 2012, alleging that "the number of persons listed on voter registration rolls in 12 counties in the State of Indiana exceed[ed] 100%" of the voting-age population. *Judicial Watch, Inc. v. King*, Doc. 1 at 5, No. 1:12-cv-800 (S.D. Ind. 2012). "[A]nother 26 counties" had "voter registration rolls that contain[ed] between 90% and 100%" of the voting-age population." *Id.* at 6. The district court denied the State's motion to dismiss, *id.*, Doc. 37, and Indiana agreed to conduct a significant, statewide process to clean up its voter rolls, *id.*, Doc. 90. The parties thus reached a settlement, and the plaintiffs voluntarily dismissed the case.

Judicial Watch filed a similar lawsuit against Ohio in 2012. Ohio had three counties reporting that more than "100% of the total voting age population" were registered to vote. *Judicial Watch, Inc. v. Husted*, Doc. 1 at 3, No. 2:12-cv-792 (S.D. Ohio 2012). An additional "thirty-one counties" had "voter registration rolls that contain[ed] between 90% and 100% of total voting age population." *Id.* at 4. After discovery, the parties settled. Like Indiana, Ohio agreed to significant reforms. With respect to dead

voters, for example, the State agreed "[t]o participate in the State and Territorial Exchange of Vital Events … to obtain out-of-state death information for list maintenance purposes under the NVRA, with monthly updates to local officials for death removals in the Statewide Voter Registration Database." *Settlement Agreement* at 2, Judicial Watch (Jan. 10, 2014), perma.cc/25RD-45KV. After the parties agreed to these terms, Judicial Watch voluntarily dismissed the case. No. 2:12-cv-792, Doc. 24.

Michigan is a frequent defendant in NVRA lawsuits. In 2019, the Public Interest Legal Foundation sued Detroit. Based on recent census data and voter registration records, PILF alleged that Detroit had 106% of its voting-age population registered to vote. *See Pub. Interest Legal Found. v. Winfrey*, Doc. 1 at 9, No. 2:19-cv-13638 (E.D. Mich. 2019). The complaint also alleged that the city's rolls included "thousands of ineligible deceased registrants" and numerous "duplicate and triplicate registrations for the same person." *Id.* at 4, 11. After it was sued, Detroit cleaned up its rolls, and PILF voluntarily dismissed the case. *See id.*, Doc. 56.

In June 2020, a voter sued Michigan's Secretary of State and Direct of Elections for violating the NVRA. The complaint alleged that one county had more registered voters than adult citizens over the age of 18, and an additional 15 counties had voter registration rates that exceeded 90 percent of adult citizens over the age of 18. *Daunt v. Benson*, Doc. 1 at 2, No. 1:20-cv-522 (W.D. Mich. 2020). The state defendants moved to dismiss, and the Court denied the motion. *See id.*, Doc. 44. The parties quickly settled. The Secretary of State agreed to slate "approximately 177,000 voter registrations … for

cancellation because the state has reason to believe the voter has moved away from the registration address." *Id.*, Doc. 58 at 5. Following that announcement, the plaintiff voluntarily dismissed the case. *See id.*

These cases barely scratch the surface of litigation holding States accountable under the NVRA. Within just the past few months, *Amicus* has filed lawsuits in Michigan and Nevada, alleging that both States continue to suffer from bloated voter rolls. Despite the Michigan Secretary of State's settlement agreement in *Daunt*, Michigan now has *fifty-three* counties with registration rates above 100% of the voting-age population. *See Republican Nat'l Comm. v. Benson*, Doc. 1 at 2, No. 1:24-cv-262 (W.D. Mich. 2024). Nevada's rolls are similarly inflated. *See Republican Nat'l Comm. v. Aguilar*, Doc. 1 at 2, No. 2:24-cv-518 (D. Nev. 2024). While the case before this Court focuses on Michigan's deficient efforts in removing dead voters from the rolls, the case filed by *Amicus* alleges that the State's maintenance efforts are also "deficient when it comes to removing voters who have changed residence." *RNC v. Benson*, Doc. 1 at 13, No. 1:24-cv-262. Michigan has snuck past Congress's requirements with temporary settlements and weak assurances. But fleeting measures secured after litigation cannot constitute a "reasonable" program to remove ineligible voters. Here, PILF has presented the latest evidence that Michigan is still failing to live up to its NVRA obligations. The district court erred by holding otherwise.

*       *       *

13

As these cases show, what qualifies as "reasonable" list maintenance is a fact question, not a policy question. Congress has already made the policy decision—States must conduct list maintenance, and their efforts must be "reasonable." 52 U.S.C. §20507(a)(4). The reasonableness standard is familiar to courts. It is deeply rooted in the common law. And Congress requires "reasonable efforts" of governmental entities throughout the U.S. Code. For example, to be eligible to receive federal aid for foster care programs, States must enact "a plan" that requires "reasonable efforts" to, among other things, "preserve and reunify families." 42 U.S.C. §671(a)(15)(B). Whether particular circumstances amount to "reasonable efforts" depends on facts and context, but there is no doubt that the phrase imposes a "generalized duty on the State" to comply with the law. *Suter v. Artist M.*, 503 U.S. 347, 363 (1992); *accord Intra-Cellular Therapies, Inc. v. Iancu*, 938 F.3d 1371, 1380-81 (Fed. Cir. 2019) (discussing a patent applicant's failure to take "reasonable efforts to conclude prosecution of the application" under 35 U.S.C. §154).

As the history of NVRA litigation shows, federal courts are well equipped to determine what list-maintenance efforts are reasonable and to fashion remedies to cure NVRA violations. That is a fact-intensive inquiry, and the district court erred by concluding that Michigan's deficient efforts are reasonable as a matter of law.

## III.   Ineffective list maintenance thwarts the purposes of the NVRA.

The NVRA has complementary objectives: "to ensure that accurate and current voter registration rolls are maintained" and "to protect the integrity of the electoral

process." 52 U.S.C. §20501(b)(3)-(4). The legislative history of the NVRA shows that maintaining "accurate and up-to-date voter registration lists is the hallmark of a national system seeking to prevent voter fraud." S. Rep. No. 103-6, at 18 (1993). And Congress understood that reasonable list-maintenance efforts—checked by public and private litigation—were necessary to ensure accurate voter rolls.

When debating an earlier version of the law, Senators and Representatives understood that the law must require basic list-maintenance efforts. Representative Swift of Washington, who helped write the NVRA in committee, stated that "[i]naccurate registration lists are the bane of every election official, can lead to fraud and are extremely costly to the states, political parties, candidates and others who depend upon them for effective voter contact." 136 Cong. Rec. 1243 (1990). He explained that "[i]n the course of our hearings, the committee discovered a wide range of procedures used by election jurisdictions around the country to update their lists." *Id.* Some of those "procedures were entirely reasonable and appropriate," while "others were questionable." *Id.* To that end, the NVRA "provides for the maintenance of accurate and up-to-date registration lists." *Id.*

Congress also understood that private enforcement was an essential component of effective voter-registration reforms. The Senate Committee Report concluded that a private right of action would "encourage action to assure that a reasonable effort is undertaken to achieve its objectives in all States and, indeed, it may be essential to the success of such a program in some areas." S. Rep. No. 103-6, at 21. To that end, "an

effective national voter registration program must also include private civil enforcement," which is "designed to assure and to encourage, to the fullest extent possible, the cooperation of local and State election officials responsible for implementation of the voter registration programs." *Id.* As the *amicus* brief of Restoring Integrity and Trust in Elections shows, the NVRA's list-maintenance provisions—enforceable only through litigation—were essential to the act becoming law. *See* Br. of RITE (Doc. 25), at 8-15.

The decision below threatens to undermine the core purposes of the NVRA: ensuring the accuracy of state voter rolls and protecting the integrity of federal elections. The record below is full of *un*reasonable efforts: permitting tens of thousands of deceased voters to remain on the rolls, failing to follow state law, declining to use federal databases, and reviewing driver's lists instead voter lists—to name just a few. *See* Blue Br. at 27-34. At a minimum, the record indicates a genuine dispute of fact as to whether Michigan is complying with the NVRA.

## CONCLUSION

The Court should reverse the district court's judgment.

16

Respectfully submitted,

*/s/ Thomas R. McCarthy*
Thomas R. McCarthy
Tiffany H. Bates
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
tiffany@consovoymccarthy.com
conor@consovoymccarthy.com

June 4, 2024                              *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Rules because it contains 4,055 words and is prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: June 4, 2024                    _/s/ Thomas. R. McCarthy_

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: June 4, 2024                    _/s/ Thomas R. McCarthy_