## No. 24-01255

IN THE

# United States Court of Appeals
### for the Sixth Circuit

---

**PUBLIC INTEREST LEGAL FOUNDATION**

*Plaintiff-Appellant*

v.

**JOCELYN BENSON**, in her official capacity as Michigan Secretary of State

*Defendant-Appellee*

**ELECTRONIC REGISTRATION INFORMATION CENTER, INC.**

*Movant-Appellee*

---

On Appeal from the United States District Court for the Western District of Michigan, Case No. 1:21-cv-00929 (Hon. Jane M. Beckering)

---

### APPELLANT'S PETITION FOR REHEARING *EN BANC*

---

J. Christian Adams
Kaylan Phillips
Joseph M. Nixon
Noel H. Johnson
Public Interest Legal Foundation, Inc.
107 S. West Street, Ste 700
Alexandria, VA 22314
(703) 745-5870
adams@PublicInterestLegal.org
kphillips@PublicInterestLegal.org
jnixon@PublicInterestLegal.org
njohnson@PublicInterestLegal.org

## STATEMENT IN SUPPORT OF *EN BANC* REVIEW

This proceeding presents questions of exceptional national importance and potential inconsistent panel decisions, including:

1. Is the NVRA's requirement of "a reasonable effort" to remove deceased registrants from the voter rolls a fact-based inquiry based upon results, or, simply the existence of any program regardless of effectiveness?

2. Does a question of fact exist under the list maintenance obligations of the NVRA when Michigan's chief election official kept tens of thousands of dead registrants on the active voter roll for *decades* after death, ignored credible evidence of deaths, was subject to state auditor reports documenting the same problem, and when other evidence of deceased registrants not being removed from the rolls exists?

3. Who has standing in a public records case?

The panel decision signals the demise of the list maintenance requirement of the National Voter Registration Act ("NVRA") by nullifying the textual obligations Congress wrote to keep voter rolls free from deceased registrants. The panel concluded that "reasonable effort" means "a program that makes a rational and sensible attempt to remove dead registrants; a state need not, however, go to 'extravagant or excessive' lengths in creating and maintaining such a program." Addendum at 14. The panel's standard is at odds with the NVRA's text. Indeed, under the panel's decision, only a wholesale repeal of list maintenance statutes and procedures would violate Section 8.

The Foundation presented credible and weighty factual problems with the Secretary's list maintenance of deceased registrants, not hypotheticals or statistical ratios that have been used in other NVRA Section 8 lawsuits, including one case currently pending before this Court. *See RNC, et al. v. Jocelyn Benson, et al.*, No. 24-01985. The Foundation evaluated just a portion of Michigan's voter roll and still found at least 27,000 likely deceased registrants with an active registration. (Ex. 6, R. 1-6, Page ID # 52.) The Foundation shared its findings with the Secretary, which she has ignored for five years.

Absent *en banc* review, the NVRA's plain text that Michigan "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of … the death of the registrant…" 52 U.S.C. § 20507(a)(4), is a dead letter. And, like the tens of thousands of deceased registrants still on Michigan's voter rolls, the Secretary can ignore it.

## I.    The Panel's Definition of a "Reasonable" List Maintenance Effort Ignored Essential Context and the Need for Factual Finding.

Prior to the panel decision, scant authority existed as to what is a violation of Section 8 of the NVRA. After the panel decision, it appears nothing could possibly violate the provision that Congress added to the NVRA to keep voter rolls clean nationwide save for an outright repeal or shutdown of all state list maintenance.

2

The plain text of Section 8 of the NVRA includes a fact-intensive inquiry. The Foundation sought a remand with instructions regarding the relevancy and weight of the factual disputes in this case. The evidence the Foundation harvested in response to the Secretary's request for summary judgment on Count I is not hypothetical or based on statistical anomalies but is specific and concrete. It is precisely the sort of evidence that would be relevant and weighty under the textual standard passed by Congress. At worst for the Foundation, it created a genuine issue of fact.

The panel turned the text of the NVRA upside down. Instead of the tens of thousands of deceased registrants on the active rolls—numbers that could flip the outcome of an election—the panel incorrectly focused on the ratio of deceased registrants identified by the Foundation to the overall total number of registrants. The panel ruled these ratios were "indicative that Michigan has taken rational, sensible steps to maintain accurate voter rolls." Addendum at 17-18.

This is an error under the NVRA's text. What matters is how many dead registrants the Secretary *missed*, not how many dead registrants one organization found. The panel accepted that "[f]rom 2019 to March 2023, Michigan cancelled between 400,000 and 450,000 registrations because the voters were deceased." Addendum at 5. The Foundation presented credible facts that the Secretary *missed*

at least 27,000 dead registrants, including active registrants that had been dead for decades. If the Secretary removes approximately 100,000 registrations per year, she could have increased her removals by 27% simply by looking into the data freely provided by the Foundation. In other words, assuming, *arguendo*, that 127,000 registrants died in one year and the Secretary removed 100,000 but missed 27,000, that could not be considered "reasonable." These three photos are samples of gravestones or obituaries of the registrants the Foundation found on Michigan's active voter roll:







4

(Ex. A, R. 168-2, Page ID # 3452, 3454, 3455.)

An articulation of how "reasonable" list maintenance is evaluated is necessary not just for this case but for the evaluation of various election officials' "reasonable efforts." Another challenge to Michigan's list maintenance program is currently pending before this Court, with argument scheduled for June 12, 2025. *See* Opening Brief at 30, *RNC, et al. v. Jocelyn Benson, et al.* No. 24-01985 (6th Cir., filed Jan. 15, 2025) ("Michigan's voter rolls are some of the worst maintained in the country. Well over half the State's counties report more active registered voters than they have voting-age residents."). There is a serious risk of inconsistent panel decisions. If the Foundation's concrete and empirical evidence is not enough to create a genuine issue of fact, then what is? 50,000 deceased registrants? 100,000? Line drawing can be difficult, which is a reason to allow a factfinder to sort it out. And yet the panel stamped 27,000 deceased registrants as "reasonable" as a *matter of law*. Those 27,000 deceased individuals could remain registered to vote for another hundred years, and in the panel's view, Michigan's program would still be "reasonable."

The Foundation stressed that "reasonable effort" must amount to a quantifiable, objective standard that may be applied to all entities subject to the NVRA. The Foundation provided examples of what the guidance would entail,

including that courts could consider (1) the cumulative number of deceased registrants on the voter rolls; (2) the time elapsed since each registrant died; (3) audits conducted by state officials; (4) evidence of bad voter roll hygiene; (5) responsiveness of election officials to information about problems; (6) lack of understanding regarding outsourced list maintenance; (7) the industry standard; (8) failure to follow state statutes and procedures; and (8) the totality of the circumstances.

The panel declined to set forth the requested guidance, stating that "[i]t is unclear what counts as 'a quantifiable, objective standard,' how a state could meet that standard, or how such a requirement could be derived from the plain language of the statute." Addendum at 14. In other words, the panel declined the opportunity to set forth the much-needed guidance that this inquiry requires. According to the panel, "[a] state that actively makes efforts to remove dead registrants based on state and federal death records is engaging in an inherently rational, sensible attempt at maintaining accurate voter registration lists." Addendum at 17. Absent from the inquiry is whether the state is following state statutes and procedures, industry standards, and whether the state's efforts are maintaining the rolls. Effort alone is not automatically a "reasonable effort," especially when those efforts leave deceased registrants on the active voter list for decades.

6

**A.    The NVRA's Legislative History Demonstrates the Importance of "Reasonable Effort."**

The NVRA would not exist without the list maintenance obligations. The legislative history provides essential context about the importance of the NVRA's list maintenance obligations. In the early versions of the NVRA that were vetoed, merely having a program that transmits information was enough. *See* H.R. 2190, 101st Cong. § 106(b) (1989). The versions that died in Congress would provide some support to the district court's grant of summary judgment, but not the version of the NVRA that became law.

Section 20507(a)(4) departs from the previous version of the bill in two ways that support *en banc* review. First, instead of the mere existence of a "program" that collects and transmits information, Congress required a "program that makes a reasonable effort." Congress added an efficacy goal and requirement, replacing the obligation for the mere existence of a plan with the obligation for a plan that works to achieve an end.

The second way that Congress expanded the requirement beyond mere information sharing (the 1989 bill) is that Congress did not delineate the minimum steps required as it did with programs to "identify registrants whose addresses may have changed." 52 U.S.C. § 20507(c). There, Congress defined a specific safe

harbor, where if those statutory procedures were used, states could properly cancel the eligibility of those who moved to a new residence. Not so for the dead.

**B.    "Reasonable Effort" Is a Fact-Intensive Inquiry.**

Reasonableness is a fact-intensive inquiry ill-suited for summary judgment in a NVRA Section 8 case. Yet, that is what the panel affirmed here.

Below, the Foundation opposed the Secretary's motion for summary judgment with concrete evidence, including that the Michigan Auditor General also identified approximately 27,000 likely deceased registrants on the voter roll, (*See* Mot. in Lim. Opp'n, R. 133, Page ID # 2697) and concrete errors in the Secretary's processing of deceased information, including that her efforts were directed at cleaning the drivers' license database when the NVRA mandates maintenance of the list of registered *voters*, not the list of registered *drivers*.[1] In every sense of the word, it is *unreasonable* to target maintenance efforts at a different database, especially when the other option is the industry standard.

---

[1] The panel states that "[n]either party disputes the factual record with respect to certain core elements of Michigan's registrant removal program." Addendum at 16. This is incorrect. *Compare id*. ("the QVF is updated based on information from the Social Security Administration's death records") *with* Addendum at 18 ("PILF states that the Social Security Administration's death files are not compared directly with the QVF.") For the purposes of this Petition, the specific factual disagreements are not discussed, just that there **are** factual disagreements.

### 1.    Questions of Reasonableness Require Factual Findings.

Courts routinely interpret and apply a "reasonable" care or effort mandate in other contexts. *See*, *e.g.*, *Virginian R. Co. v. Sys. Fed'n*, 300 U.S. 515, 550 (1937) (involving language in a law that requires "every reasonable effort to make and maintain agreements"); *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 415 (6th Cir. 2021) (holding, "Nissan's three-week delay in investigating explicit allegations of unwanted physical invasions creates a question of reasonableness that should be resolved by a jury.").

The Foundation opposed summary judgment in part by reliance on the testimony of one of its experts, the former chief election official for the State of Colorado, Scott Gessler. (Summ. J. Opp'n, R. 168, Page ID # 3415.) Mr. Gessler explained that "the NVRA imposes a duty of care to require states to act reasonably. Mere effort is inadequate …. In assessing reasonableness, I consider (1) what would constitute a prudent course of action, and (2) whether the benefits of a general program outweigh the costs." (Ex. D, R. 168-5, Page ID # 3477.) Mr. Gessler detailed numerous examples of actions and inactions he believed to be unreasonable. Mr. Gessler's opinions created a genuine issue of material fact as to prevailing professional norms of reasonable list maintenance regarding deceased

registrants. The Secretary offered no testimony by election officials elsewhere. Yet summary judgment was affirmed.

### 2.    Multiple Genuine Issues of Material Fact Exist About Whether the Secretary Has a Reasonable List Maintenance Program to Remove Deceased Registrants.

The Foundation presented multiple genuine issues of material fact concerning whether the Secretary has a reasonable list maintenance program to remove deceased registrants, including whether:

1. The presence of tens of thousands of deceased individuals, found by both the Foundation and the Michigan Auditor General, is reasonable.

2. The Secretary follows Michigan election statutes and procedures.

3. Michigan's comparison of death information against the Driver's File rather than the Voter Roll is reasonable.

4. Michigan's lack of responsiveness is reasonable.

5. The totality of the circumstances creates a factual dispute.

Nevertheless, the panel affirmed the summary judgment order. *En banc* review is necessary to establish the proper standard by which the factfinder should adjudicate multiple genuine issues of material fact on questions of reasonableness under the NVRA.

## II.     The Panel Decision Conflicts with Supreme Court Decisions Establishing the Standing Framework for Public Records Laws.

The Foundation's second count involved denial of public records under the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1). The lower court found that the claim was moot. The Foundation explained on appeal why the District Court erred. Instead of reaching that question, the panel dismissed the claim, finding that the Foundation "does not have standing to assert" it. Addendum at 19.

The panel decision means voter registration mistakes, malfeasance, and even voting discrimination will stay hidden. Congress made "all" voter list maintenance records public. If a voting rights organization like the Foundation does not have standing here, then the transparency Congress intended does not exist.

### A.     *TransUnion* Explicitly Distinguished Public Records Cases.

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), is a credit reporting case, not a public records case. The plaintiffs sued a private credit reporting agency for violations of the Fair Credit Reporting Act ("FCRA"). *TransUnion*, 594 U.S. at 417-18. Among other things, the plaintiffs "complained about formatting defects in certain mailings sent to them by TransUnion." *Id.* at 418. Plaintiffs received all the information required by FCRA, but in two separate mailings, when it should have been sent in one. *See id*. at 440-441.

11

The United States, as *amicus curiae*, argued that the plaintiffs had standing under *Pub. Citizen v. United States Dep't of Just.*, 491 U.S. 440 (1989) and *FEC v. Akins*, 524 U.S. 11 (1998). *TransUnion*, 594 U.S. at 441. The Supreme Court held that those cases "do not control" because they "involved denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information." *Id*. "This case does not involve such a public-disclosure law." *Id*. *TransUnion* involved the FCRA, a law that regulates private parties, not the government. The injury in *TransUnion* was fundamentally different than with public disclosure laws. "The plaintiffs did not allege that they failed to receive any required information. They argued only that they received it *in the wrong format*." *Id*. (emphasis in original). Only after distinguishing *Public Citizen* and *Akins* as disclosure or sunshine law cases did the Supreme Court add, "Moreover, the plaintiffs have identified no 'downstream consequences' from failing to receive the required information." *Id*. at 442.

The conclusion is this: where plaintiffs allege that they "failed to receive information" under a public disclosure or sunshine law, the standing inquiry is controlled by *Public Citizen* and *Akins*. *See id.* at 441. Where plaintiffs allege that they received information but received it in the *wrong format*—as in *TransUnion*—plaintiffs must allege some additional harm caused by the formatting

12

error. *See id.* at 442. Only the latter is "bare procedural violation," which requires plaintiffs to allege "downstream consequences." *Id.* at 440.

Under *Public Citizen* and *Akins*, "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Akins*, 524 U.S. at 21 (citing *Public Citizen*, 491 U.S. at 449). The Foundation alleges that it failed to obtain information requested under NVRA. The Foundation has the predicate injury to establish standing.

**B.    The Panel Decision Created a Conflict with Another Circuit Court, and Consequently, an Issue of Exceptional Importance.**

The Fourth Circuit, in *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2023), rejected the argument that Article III requires plaintiffs to demonstrate downstream consequences when they are denied public information. To the contrary, "*Havens Realty*, *Public Citizen*, and *Akins* are clear that a plaintiff need not show a use for the information being sought in order to establish an injury in fact in satisfaction of the first *Lujan* element." *Laufer*, 60 F.4th at 172. Why not? Because "the informational injuries in *Public Citizen* and *Akins* (the 'fail[ure] to receive *any* required information')" are distinguishable "from the purported informational injury [in *TransUnion*] (receipt of the required information '*in the wrong format*')." *Id.* at 170 (quoting *TransUnion*, 594 U.S. at 441 (first emphasis added)). Therefore, "any use requirement is limited to the type of informational

13

injury at issue in *TransUnion* and does not extend to the type of informational injury presented in *Public Citizen* and *Akins*." *Id*. at 170.

This case presents the type of informational injury at issue in *Public Citizen* and *Akins*—the failure to receive *any* required information. Because the Foundation failed to receive records under NVRA, the Foundation has suffered an actionable informational injury.

### C.    *Akins* Rejects the Nexus, or Use, Requirement.

Supreme Court precedent also rejects the need for a nexus or use requirement. In *Akins*, the dissenting Justices argued that the plaintiffs must show a logical nexus between their status and the claim asserted. *See Akins*, 524 U.S. at 22. The majority disagreed, explaining that, "the 'logical nexus' inquiry is not relevant" where the statute protects plaintiffs from "failing to receive particular information[.]" *Id*. The same is true with the NVRA and therefore no "nexus" must be shown.

As to the Supreme Court's statements concerning the plaintiffs' intended uses for the requested records, the Fourth Circuit stated: "[A]lthough the plaintiffs in *Public Citizen* and *Akins* thereafter asserted uses for the information they sought, those asserted uses were not a factor in the *Public Citizen* and *Akins* Article III standing analyses." *Laufer*, 60 F.4th at 170. This makes sense because any "use"

14

requirement cannot coexist with the Supreme Court's standard: "[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Akins*, 524 U.S. at 21 (citing *Public Citizen*, 491 U.S. at 449).

### D.    The Foundation Has Suffered "Downstream Consequences."

The panel decided that the Foundation's "failure to articulate specific downstream consequences demonstrates that PILF has failed to show a sufficient injury to confer Article III standing." Addendum at 23.

The Foundation requested records in this case to pursue an action directly related to the Secretary's list maintenance program for deceased registrants. Congress designed the NVRA to shine a light on circumstances just like these. The Foundation cared about this issue so much that it conducted its own investigation into the voter roll and, finding tens of thousands of deceased registrants, filed a federal lawsuit. Meanwhile, the Secretary ignored her obligations to allow inspection of records under the NVRA. If the Foundation does not have standing to compel disclosure of records in this case, then the transparency Congress intended is dead. *See Public Citizen*, 491 U.S. at 449 (finding plaintiffs have standing where plaintiffs sought "access to the ABA Committee's meetings and records in order to monitor its workings").

15

The panel erred when it believed the Fifth Circuit's decision in *Campaign Legal Ctr v. Scott*, 49 F.4th 931 (5th Cir. 2022), means the Foundation lacks standing. There, the plaintiffs "obtained an injunction from the district court requiring the State of Texas to provide information including the names and voter identification numbers of persons suspected of being noncitizens though registered to vote." *Id*. at 932-933.

On appeal, the Fifth Circuit reversed and remanded with instructions to dismiss, holding that the plaintiffs did not adequately allege a sufficient injury to establish standing. *Id*. at 939. The Fifth Circuit interpreted the Supreme Court's decision in *TransUnion* to mean that "even in public disclosure-based cases, plaintiffs must and can assert 'downstream consequences,' which is another way of identifying concrete harm from governmental failures to disclose." *Id*. at 938.

The Court explained:

> On appeal, Plaintiffs attempt to establish standing by asserting three theories of informational injury standing. First, Plaintiffs contend that as "civic engagement organizations . . . [they] have standing to request records under the NVRA[]" and therefore have a right to the requested registrant records. Second, they maintain that "there is [a] downstream injury with respect to the public not having visibility into how Texas is keeping its voter lists[.]" Third, Plaintiffs assert that "there is [a] downstream injury with respect to the public not having visibility into . . . properly registered Texans being discriminated against and burdened in their right to vote." The first theory was rejected by this court only a few weeks ago, and the other two theories encompass no

more than alleged injuries to *the public* and *affected Texas voters* writ large.

*Id*. at 936 (emphasis in orginal).

The Fifth Circuit then gave two situations where a plaintiff would have standing to request records under the NVRA: where disclosure "will directly lead to action relevant to the NVRA or any other statute," and when the plaintiff's "direct participation in the electoral process will be hindered." *Id*. at 938. The Foundation sought records from the Secretary precisely to pursue "action relevant to the NVRA." *Id*. Indeed, the Foundation took that action under Count I. Unlike *Scott*, there is nothing "speculative" about whether the Foundation would pursue an action using the requested records.

The Foundation's Complaint satisfies the *Scott* standard because it describes the Foundation's programmatic activities that are relevant to **this action** *and* alleges that it "seeks to promote the integrity of elections in Michigan and other jurisdictions nationwide through research, education, remedial programs, and litigation." (R. 1, Page ID # 2.) Further, "[t]he Foundation communicates with election officials about problems or defects found in list maintenance practices and about ways to improve those practices." (*Id*.) The Secretary has impaired the accumulation of institutional knowledge to assist and inform these core functions. The Foundation's injuries thus exceed the mere deprivation of information.

17

Whereas the plaintiffs in *Scott* alleged speculative injuries to others not before the court, 49 F.4th at 936, the Foundation alleges concrete and imminent injuries to itself and this action that are directly traceable to the Secretary's refusal to disclose information under the NVRA. The "downstream consequences" the Foundation identifies are consistent with the examples articulated by the *Scott* concurrence, including the need "to engage in public advocacy about a pressing matter of policy." *Scott*, 49 F.4th at 940 (Ho, J., concurring in the judgment). *See also*, *United States v. McDowell*, No. 3:19-cr-14-RGJ, 2023 U.S. Dist. LEXIS 161185, at *6-7 (W.D. Ky. Sep. 11, 2023) ("Smithers also appears to satisfy the Fifth Circuit's interpretation, which suggests that a downstream consequence includes the inability to use the sealed information for a distinct, civic purpose.").

Further, *Scott* did not alter the standing landscape. As this Court recently explained,

> Since *TransUnion*, the courts of appeals have consistently recognized that, to have standing, a plaintiff claiming an informational injury must have suffered adverse effects from the denial of access to information. *See … Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 936-39 (5th Cir. 2022); … And courts have further recognized that *TransUnion* did not work a "sea change"
>
> …
>
> Two earlier Supreme Court informational-injury cases are not to the contrary. *See* [*Akins*]; [*Public Citizen*].

*Grae v. Corr. Corp. of Am*., 57 F.4th 567, 570 (6th Cir. 2023).

## CONCLUSION

The Foundation requests that the *en banc* petition be granted.

Dated: May 30, 2025.

Respectfully submitted,

For the Plaintiff Public Interest Legal Foundation:


  /s/ Kaylan Phillips
J. Christian Adams
Kaylan Phillips
Joseph M. Nixon
Noel H. Johnson
Public Interest Legal Foundation, Inc.
107 S. West Street, Ste 700
Alexandria, VA 22314
(703) 745-5870
adams@PublicInterestLegal.org
kphillips@PublicInterestLegal.org
jnixon@PublicInterestLegal.org
njohnson@PublicInterestLegal.org

19

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Fed. R. App. P. Rule 40(d)(3) because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 3,893 words.

This brief also complies with the typeface requirements Fed. R. App. P. 32(a)(5)(A) because this brief has been prepared in a proportionally space type face using Microsoft Word in 14-point Times New Roman.


  /s/ Kaylan Phillips
Kaylan Phillips
Counsel for Public Interest Legal Foundation

Dated: May 30, 2025.

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2025, I electronically filed the foregoing using the Court's ECF system, which will serve notice on all parties.

 /s/ Kaylan Phillips
Kaylan Phillips
Counsel for Public Interest Legal Foundation

Addendum

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PUBLIC INTEREST LEGAL FOUNDATION,

       *Plaintiff-Appellant,*

  *v.*

JOCELYN BENSON, in her official capacity as Secretary of State of Michigan,

       *Defendant-Appellee,*

ELECTRONIC REGISTRATION INFORMATION CENTER, INC.,

       *Movant-Appellee.*

No. 24-1255

_____

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cv-00929—Jane M. Beckering, District Judge.

Decided and Filed:  May 6, 2025

Before: CLAY, WHITE, and DAVIS, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** J. Christian Adams, Kaylan Phillips, Joseph M. Nixon, Noel H. Johnson, PUBLIC INTEREST LEGAL FOUNDATION, Alexandria, Virginia, for Appellant.  Erik A. Grill, Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee Jocelyn Benson.  Robert A. Wiygul, Peter V. Keays, HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER, Philadelphia, Pennsylvania, for Appellee Electronic Registration Information Center.  Benjamin M. Flowers, ASHBROOK BYRNE KRESGE LLC, Cincinnati, Ohio, Thomas R. McCarthy, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, David Eric Lycan, EMBRY MERRITT WOMACK NANCE, PLLC, Lexington, Kentucky, T. Russell Nobile, JUDICIAL WATCH, INC., Gulfport, Mississippi, for Amici Curiae.

———————————

## OPINION

———————————

CLAY, Circuit Judge.    This case concerns the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507.  Plaintiff Public Interest Legal Foundation ("PILF") filed a two-count complaint alleging that Defendant Jocelyn Benson ("Secretary Benson"), in her official capacity as Michigan Secretary of State, has not complied with the NVRA by (1) failing to conduct maintenance of voter registration lists, and (2) failing to allow inspection of public records and data.  PILF specifically alleges that the State of Michigan has failed to make adequate efforts to remove dead registrants from voter rolls and has refused to grant PILF access to public records relating to those voter rolls.  Secretary Benson subsequently moved for summary judgment, which the district court granted.  For the reasons that follow, we **AFFIRM** the district court's judgment.

## I.  BACKGROUND

### A.  Federal and State Election Laws at Issue

This case centers on the obligations the NVRA imposes on states to remove deceased registrants from voter rolls.  The NVRA was passed by Congress to protect the integrity of the nation's elections.  Congress specifically outlined that the law's central goal was to establish "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," making "it possible for Federal, State, and local governments to implement this [Act] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office," protecting "the integrity of the electoral process," and ensuring "that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b).

In keeping with this goal, § 8 of the NVRA—the section at issue in this case—focuses on the removal of ineligible registrants from voting rolls.  Among the classes of voters contemplated by § 8 is the class of deceased registrants.  Section 8 prescribes that states must, inter alia, "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant."

52 U.S.C. § 20507(a)(4)(A).  The section also requires that states allow public inspection of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  *Id.* § 20507(i)(1).  The NVRA provides a private right of action for "declaratory or injunctive relief" by a "person who is aggrieved by a violation" of the NVRA.  *Id.* § 20510(b).

Congress continued its attempt to secure voting integrity in 2002 when it passed the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901–21145 (2012)).  HAVA's provisions include a requirement that states "shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State. . . ." 52 U.S.C. § 21083(a)(1)(A).  The statute further requires that this "computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State."  *Id.* § 21083(a)(1)(A)(viii).

The State of Michigan has enacted a statutory scheme to come into compliance with both the NVRA and HAVA.  The relevant portions of that scheme include language stating that the Michigan Secretary of State serves as the state's top election official and is responsible for ensuring Michigan's compliance with the NVRA and HAVA.  Mich. Comp. Laws § 168.509n.  The scheme also created the "qualified voter file" ("QVF"), which is the state's computerized statewide voter registration list as required by HAVA.  *Id.* §§ 168.509m(1)(a), 168.509o, 168.509p, 168.509q, 168.509r.  Michigan law requires that, to keep the QVF current, the Secretary of State must establish

> a process by which information obtained through the United States Social Security Administration's death master file that is used to cancel an operator's or chauffeur's license . . . or an official state personal identification card . . . of a deceased resident of this state is also used at least once a month to update the qualified voter file to cancel the voter registration of any elector determined to be deceased.

*Id.* § 168.509o(4).  The law also requires that the Secretary "make the canceled voter registration information . . . available to the clerk of each county, city, or township to assist with the clerk's obligations under section 510."  *Id.*

Michigan law prescribes a variety of avenues to keep the QVF current and ensure that deceased voters are removed from the roll. For example, one statute prescribes that "[a]t least once a month, the county clerk shall forward a list of the last known address and birth date of all individuals over 17- ½ years of age who have died in the county to the clerk of each city or township in the county." Mich. Comp. Laws § 168.510(1). Additionally, local clerks are empowered to operate programs "to remove names of registered voters who are no longer qualified to vote in the city or township from the registration records of that city or township." Mich. Comp. Laws § 168.509dd(1). Local clerks may also engage in house-to-house canvassing, send "general mailing to voters for address verifications," participate "in the national change of address program established by the postal service," or "[o]ther means the clerk considers appropriate." Mich. Comp. Laws § 168.509dd(3).

Outside of statutory prescriptions, the Secretary of State's office oversees a number of operations to keep the QVF current. According to Secretary Benson, her office uses four separate steps to remove deceased voters from the QVF. First, the state maintains a software system known as "CARS," which supports the "driver file," a database that includes the personal information of all vehicle drivers and individuals with state identification in Michigan. CARS receives weekly updates from federal agencies regarding deaths of Michigan residents. If there is an exact match between the information from the federal agency (name, date of birth, and social security number) and the information stored in CARS, and if that individual is listed on the QVF, the QVF is automatically updated to reflect the voter registrant's death. If the information provided from the federal government partially matches the information in CARS, the potential match is manually reviewed by a state unit to determine whether there is a match.[1]

Second, state officials utilize CARS in conjunction with the federal Social Security Administration. State officials produce a weekly report from CARS that lists individuals whose license or state identification are expiring within 90 days so that the state can mail the individuals

---

[1]According to Secretary Benson, "[i]f there are at least 3 data points that match, the individual will be marked as deceased in CARS. Once the customer record is updated in CARS, QVF is automatically updated." R. 149-3, Page ID #3086. Partial matches are typically reviewed within 7 to 10 days, though Secretary Benson acknowledges that backlogs of up to four weeks sometimes occur. R. 149-4, Page ID #3101–02.

renewal notices. Before mailing these notices, the file is shared with the Social Security Administration, and the Social Security Administration will provide a death indicator on the report if an individual is reported deceased. CARS will then update the individual's record as deceased and transmit that information to the QVF.

Third, members of the public can send information relating to the death of a registrant. For example, an individual may send in a death certificate of an immediate family member. This information from the public would then be updated in CARS and sent to the QVF.

Fourth, the Bureau of Elections ("BOE") works in conjunction with Movant-Appellee Electronic Registration Information Center, Inc. ("ERIC"), a non-profit, non-partisan membership organization that is incorporated in Delaware.[2] ERIC transmits records of potentially deceased individuals to BOE. ERIC creates these reports by comparing the QVF against the Social Security Administration's death index and identifying potential matches. BOE then reviews the records manually to determine whether there is a match between ERIC's records and a voter's records. ERIC's bimonthly reports help address a subset of voters that may otherwise be overlooked by relying solely on the CARS database: voters who lack a driver's license or state ID card.

From 2019 to March 2023, Michigan cancelled between 400,000 and 450,000 registrations because the voters were deceased. R. 149-2, Page ID #3077. Michigan is consistently among the most active states in cancelling the registrations of deceased individuals; despite the fact that Michigan ranks 10th in voting-age population, the U.S. Election Assistance Commission reported that Michigan removed the sixth largest total number of registrations based on death in the 2016 election cycle; the fourth most in the 2018 cycle; the fifth most in the 2020 cycle; and the fifth most in the 2022 cycle.[3]

---

[2]ERIC is involved in this appeal because certain of the discovery orders challenged by PILF pertained to third-party subpoenas directed at ERIC.

[3]U.S. Election Assistance Comm'n, *The Election Administration and Voting Survey 2016 Comprehensive*; U.S. Election Assistance Comm'n, *The Election Administration and Voting Survey 2018 Comprehensive Rep.* 82 (NVRA Table 3b) (2018), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; U.S. Election Assistance Comm'n, *The Election Administration and Voting Survey 2020 Comprehensive Rep.* 165 U.S. Election Assistance Comm'n, *The Election Administration and Voting Survey 2022 Comprehensive Rep.* 188 (Voter Registration Table 5) (2022), https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf (last visited Oct. 22, 2024).

## B.  PILF's Correspondence with Secretary Benson's Office

PILF is a "is a non-partisan, non-profit, public interest organization" that "seeks to promote the integrity of elections in Michigan and other jurisdictions nationwide."   Compl., R. 1, Page ID #2.   In the lead-up to, and in the months following, the 2020 election, PILF contacted Secretary Benson and BOE multiple times regarding deceased registrants on the active voter rolls. PILF's first contact with Secretary Benson occurred on September 18, 2020, in which the organization alleged that Secretary Benson's office had failed to adequately monitor deceased voters and that the organization had conducted its own study showing "34,000 deceased individuals" were actively registered in the State of Michigan.   R. 1-4, Page ID #48–50.   The letter further requested "an immediate meeting . . . to discuss what action will be taken to bring Michigan into compliance with state and federal law."   *Id.* at Page ID #48.   BOE responded to this letter 12 days later, requesting that PILF "provide a written description of the matching criteria used . . . to substantiate these allegations" and a list of the voters that PILF identified as potentially deceased. R. 11-2, Page ID #126.   On October 5, 2020, PILF provided a spreadsheet and a letter ("October 5, 2020 Letter") describing the findings, stating that the organization produced "more than 27,000 records of concern" by comparing Michigan's QVR with the Social Security Death Index and "matching full names, full dates of birth, Social Security numbers, and credit address history information." R. 1-6, Page ID #52–53.   PILF noted that the remainder matched "other verifiable death record sources." *Id.* Neither BOE nor the Michigan Department of State ("MDOS") responded to this letter.[4]

On November 25, 2020, PILF sent another letter to Secretary Benson and Jonathan Brater, BOE Director.   This letter was a "follow-up" to the previous correspondence, reflected PILF's findings as to a new copy of the QVF, and requested a meeting.   R. 1-8, Page ID #61–62.   After failing to receive a response, PILF sent "another follow-up" letter on December 11, 2020 ("December 11, 2020 Letter"), requesting that Secretary Benson

---

[4]Michigan Director of Elections Jonathan Brater stated in a deposition that BOE did not respond to the letter because of time constraints on the BOE.  Specifically, Director Brater outlined that the BOE was consumed with mailing and later counting larger-than-normal absentee ballots due to the COVID-19 pandemic, staff shortages due to the pandemic, post-election canvasses that faced turbulence due to attempts to prevent certification of the election, and countering "a high volume of false information being made about the election."  R. 149-2, Page ID #3083.

"permit inspection or provide copies" of records relating to deceased voters.  Dec. 11, 2020 Letter, R. 1-9, Page ID #63–64.  Specifically, PILF sought four categories of records: (1) data files received from the federal Social Security Administration listing deceased individuals; (2) records relating to the cancellation of deceased registrants from the QVF, including but not limited to reports that have or can be generated from Michigan's QVF; (3) records relating to the investigation of potentially deceased registrants who are listed on the QVF, including but not limited to correspondence with local election officials; and (4) records and correspondence regarding use of ERIC to conduct voter roll list maintenance.  PILF also stated that it planned "to send a representative to [Secretary Benson's and/or the BOE's] office to inspect these documents on December 18, 2020." *Id.* at Page ID #64.  The BOE responded on December 17, 2020, again requesting PILF's matching criteria.  A week later, PILF sent a letter to Secretary Benson stating "that the Michigan Secretary of State is in violation of the [NVRA] for failure to permit inspection and duplication of public records . . . ."  R. 1-11, Page ID #67.  The letter further requested that because Secretary Benson's office was "closed to the public," that the office "provide the requested records electronically immediately." *Id.* at Page ID #68.  PILF sent one final letter requesting inspection on January 13, 2021; MDOS did not respond to the letter.

### C.  Procedural History

On November 2, 2021, PILF filed a two-count complaint against Secretary Benson in the district court, alleging two violations of the NVRA: (1) failure to conduct list maintenance and (2) failure to allow inspection of records and data.  The parties then proceeded to discovery.

A number of PILF's discovery requests are relevant to the instant appeal.  First, in February 2023, PILF sought to depose Secretary Benson.  Secretary Benson moved for a protective order against the deposition unless PILF could establish that the information sought could not come from other witnesses or means.  The magistrate judge granted Secretary Benson's protective order without prejudice, noting that she was "unpersuaded" that the deposition was necessary for PILF's action.  Protective Order Hr'g Tr., R. 75, Page ID #813.  However, the magistrate judge did note that PILF could seek to depose Secretary Benson if

"depositions or something else reveals that there is some information or some issue about which only Secretary Benson would testify or if Defendant were to insert Secretary Benson's testimony in the litigation in some way." *Id.* at Page ID #810. PILF did not appeal the magistrate judge's order or renew its effort to depose Secretary Benson.

Second, PILF served subpoenas on non-party ERIC in March 2023, requesting production of documents and a deposition of the organization. ERIC moved to quash the subpoena. In a June 2023 hearing on the matter, the magistrate judge stated that PILF's subpoena "appear[s] to be a fishing expedition, and not only that but also because [the subpoena requests are] so far outside the core of this case to be potentially an abuse of the process before this Court." Mot. Quash Hr'g Tr., R. 108, Page ID #1956–57. The magistrate judge also found that PILF's requested discovery into ERIC was irrelevant to the litigation, and thus quashed the subpoena. PILF appealed the magistrate judge's determination, which the district court denied.

Finally, after discovery had closed in July 2023, PILF filed a motion to depose Stuart Talsma, an MDOS analyst, for a second time. This motion was filed in response to a supplemental document production that Secretary Benson filed in September 2023, also after the close of discovery. That supplement included a document produced by Talsma ("Talsma Supplement") regarding the status of the 27,000 "potentially deceased" voters PILF had identified in the October 5, 2020 Letter. PILF filed a motion to "depose Mr. Talsma regarding this document because it is relevant to the claims and defenses in this case." R. 144, Page ID #2971. The magistrate judge denied this request. Specifically, the magistrate judge noted that PILF had failed to explain "what additional discovery is required at this point of Mr. Talsma and why you're entitled to it." Talsma Mot. Hr'g Tr., R. 163, Page ID #3304. Furthermore, the magistrate judge noted that the information sought could be obtained through other means, including either requesting Secretary Benson to produce the underlying spreadsheet used to produce the Talsma Supplement, or requesting Secretary Benson update her response to PILF's interrogatory request relating to "categories of voter status and status reasons that are included in the report and what those mean." *Id.* at Page ID #3320. Secretary Benson subsequently agreed to both provide the underlying spreadsheet to PILF and

to update her interrogatory response. *Id.* at Page ID #3321. Secretary Benson provided these materials on October 19, 2023, and PILF did not appeal the magistrate judge's order.

Following discovery, both PILF and Secretary Benson moved for summary judgment. PILF also filed a motion pursuant to Federal Rule of Civil Procedure 56(d), arguing that Secretary Benson's motion for summary judgment should be denied or deferred because PILF "ha[d] not been permitted to conduct all relevant discovery." Mot. for Disc., R. 170, Page ID #3517–18. Specifically, PILF argued that it had not been permitted to (1) depose Secretary Benson, (2) obtain documents from ERIC, and (3) depose Talsma. The district court ultimately denied PILF's summary judgment motion and granted Secretary Benson's summary judgment motion, finding that PILF had failed to show sufficient evidence for its list-maintenance count and that its disclosure-obligations count was moot. The district court also denied PILF's Rule 56(d) motion, stating that each of the evidentiary issues were already litigated in previously filed motions and that PILF did not "articulate any specific facts that it believes it will obtain from Secretary Benson, ERIC, or Talsma that would demonstrate the existence of a question of fact." Summ. J. Order, R. 180, Page ID #3660.

## II. DISCUSSION

### A. Standard of Review

"We review the district court's grant of summary judgment de novo." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citation omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of a material fact is genuine so long as 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Kirilenko-Ison*, 974 F.3d at 660 (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)). This Court reviews decisions on summary judgment by "view[ing] the factual evidence and draw[ing] all reasonable inferences in favor of the non-moving party." *See v. City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007).

In reviewing a district court's decisions to deny or limit the scope of discovery, this

Court reviews for an abuse of discretion.  *Siggers v. Campbell*, 652 F.3d 681, 695–96 (6th Cir. 2011).   A court abuses its discretion "when the reviewing court is left with a definite and firm conviction that the court below committed a clear error of judgment."  *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642 (6th Cir. 2018) (citation and quotation marks omitted).

## B. Analysis

### 1. Discovery Dispute

 PILF argues that during the course of litigation, it was unfairly deprived of its opportunity to conduct the following discovery: (1) deposing Secretary Benson regarding "list maintenance procedures and directives," (2) obtaining documents from ERIC regarding the comparison between the QVF and the Social Security Administration's death records, and (3) deposing Stuart Talsma regarding the Talsma Supplement.   Appellant Br., ECF No. 21, 39–41.   According to PILF, these denials by both the district court and the magistrate judge touched "the heart of the ultimate factual questions" in this case, and it was therefore improper for the district court to grant summary judgment without this evidence.[5]   *Id.* at 39.   This argument misses the mark.

To begin, the only discovery-related appeal PILF filed in the district court was its appeal of the magistrate judge's decision to quash PILF's subpoena to ERIC.  PILF did not appeal the magistrate judge's discovery orders regarding the requested depositions of Secretary Benson and Talsma.  Because of this failure, we lack jurisdiction to review any more than the quashed ERIC subpoena.  *Hoven v. Walgreen Co.*, 751 F.3d 778, 782 (6th Cir. 2014) (finding that where a magistrate judge considers pretrial matters on a "limited grant of authority . . . pursuant to 28 U.S.C. § 636(b)(1)(A)," not a grant of "plenary jurisdiction pursuant to 28 U.S.C. § 636(c)(1)," then "we are 'without jurisdiction to review the magistrate's order unless the parties have sought review in the district court'" (quoting *McQueen v. Beecher Cmty.*

---

[5]Secretary Benson notes that PILF's brief "does not specify whether it seeks to appeal the district court's denial of its Rule 56(d) motion, or if it is appealing the underlying discovery motions."   Def.-Appellee Br., ECF No. 35, 68–69.   However, PILF's brief does not mention the Rule 56(d) motion, and instead focuses on the denial of the discovery requests themselves.   PILF's Reply Brief also focuses on the denial of the discovery requests and not the Rule 56(d) motion.   It therefore appears that PILF is appealing the district court and magistrate judge's denial of the three relevant discovery requests.

*Schs.*, 433 F.3d 460, 472 (6th Cir. 2006))).   In a series of unnumbered docket entries, the district court referred the issues of the Secretary Benson and Talsma depositions to the magistrate judge on a limited grant of authority pursuant to § 636(b)(1)(A).   PILF's failure to appeal the magistrate judge's subsequent decisions is therefore fatal to its present appeal.

We therefore limit our review to the ERIC subpoena, which PILF did appeal.   Lower courts are afforded broad leeway in managing discovery.   *See Pittman*, 901 F.3d at 642.   As this Court has recognized, "[i]t is well established that the scope of discovery is within the sound discretion of the trial court." *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993) (citation omitted).   To demonstrate that reversal of the court's exercise of discretion is warranted, a litigant must make "a clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant." *Pittman*, 901 F.3d at 642 (cleaned up). At the summary judgment phase, the complaining litigant must "demonstrate that the discovery sought would have precluded summary judgment." *Stiltner v. Donini*, No. 20-4136, 2021 WL 5232339, at *3 (6th Cir. Aug. 9, 2021).

Regarding the discovery requests pertaining to ERIC, PILF has failed to demonstrate prejudice.   PILF's Reply Brief speaks at length on the magistrate judge's abuse of discretion with respect to the ERIC discovery request, but does not reference PILF's burden in showing prejudice.   PILF's conclusory statement that "[p]rejudice is inherent on an unequal playing field" does not meet its burden.   Appellant Reply Br., ECF No. 38, 24.   PILF has not demonstrated how the requested discovery would have altered the district court's summary judgment determination.   For example, PILF has not concretely articulated what facts it believes it could have obtained from ERIC that would have impacted the district court's order.

Considering PILF has not demonstrated prejudice, this Court cannot find that either the magistrate judge or the district court abused their discretion in resolving PILF's discovery motion relating to the ERIC subpoena.   As such, PILF cannot maintain its argument that the district court erred in determining summary judgment without reviewing the requested evidence.

### 2.   Summary Judgment as to Count I

Count I of PILF's complaint alleged a violation of the NVRA for failure to conduct list maintenance.   The district court granted Secretary Benson summary judgment on this count, finding that undisputed facts in the record demonstrated that Michigan's dead-registrant-removal program constituted a reasonable effort under the NVRA.

### a.   *Interpretation of the NVRA's Reasonableness Standard*

The core of this case centers on a question of statutory interpretation: what efforts must a state make in order to meet the NVRA's "reasonable effort" requirement?   The language of the statute requires, in relevant part, that states "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant." 52 U.S.C. § 20507(a)(4)(A) (emphasis added).   Beyond this, Congress did not give any further guidance on what a "reasonable effort" must look like.   Congress did not, for example, enumerate what steps a state should take to come into compliance with this standard.[6]   In interpreting this language, the district court found that PILF had failed to identify any "genuine issue for trial regarding its claim that" Michigan's program for removal of dead registrants "is not reasonable."   Summ. J. Order, R. 180, Page ID #3660–61.   The district court specifically noted that "the NVRA requires only a 'reasonable effort,' not a perfect effort, to remove registrants who have died," and that Michigan's program meets the requisite level of effort. *Id.* at Page ID #3659.

PILF argues that the district court erred in its interpretation of what a reasonable effort requires.   According to PILF, a reasonable effort "to remove deceased registrants must amount to a quantifiable, objective standard that may be applied to all entities subject to the NVRA, including [Secretary Benson]." Appellant Br., ECF No. 21, 17.   To support its articulation of what it believes should constitute the reasonable effort standard, PILF looks to a number of supporting guides.   PILF draws on the NVRA's legislative history by, for example, indicating that the negotiations during the NVRA's passage process produced multiple drafts of the bill, in which later versions included much stronger language related to removal of dead

---

[6] This Circuit has also not opined on what measures constitute a reasonable effort under the NVRA.

registrants.[7]   Outside of legislative history, PILF highlights the U.S. Department of Justice's efforts in enforcing the NVRA.   It notes that the Justice Department has issued statements highlighting that voter list maintenance requires a vigorous effort and that the Justice Department has also filed suit against a number of states for failing to maintain proper list maintenance.

PILF's interpretation of the NVRA's "reasonable effort" language is misplaced.   To determine the meaning of a statute, this Court has emphasized that "[t]he starting point . . . is the language of the statute itself."   *United States v. Plavcak*, 411 F.3d 655, 660 (6th Cir. 2005) (quoting *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210 (1979)).   "This inquiry begins—and sometimes ends—with the plain language of the statute.  If the language of the statute is clear, the court applies the statute as written."   *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 253 (6th Cir. 2020) (cleaned up).   In looking at the language of a statute, "words will be interpreted as taking their ordinary, contemporary, common meaning," as "it is appropriate to assume that the ordinary meaning of the language that Congress employed 'accurately expresses its legislative purpose.'"   *Plavcak*, 411 F.3d at 660–61 (first citing *Perrin v. United States*, 444 U.S. 37, 42 (1979); and then quoting *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164 (1985)).   A review of the plain, ordinary meaning of § 8's language demonstrates that PILF's reading of the reasonable effort requirement is flawed.

The NVRA does not include a definition of "reasonable effort."   Thus, to determine the common meaning of the phrase "reasonable effort," a turn to dictionary definitions is instructive.  *See Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1060 (6th Cir. 2014) ("Where no statutory definition exists, a court may consult a dictionary definition for guidance in discerning the plain meaning of a statute's language.") (citation omitted). Webster's Third New International Dictionary—published in 1993, the year of the NVRA's passage—defines "reasonable" as "being in agreement with right thinking or right judgment : not conflicting with reason : not absurd : not ridiculous."   Reasonable, Webster's Third New

---

[7]Amici curiae Republican National Committee and Restoring Integrity and Trust in Elections turn the Court's attention to the statements of legislators during the bill's negotiations.  Those statements, according to amici, demonstrate that ensuring a rigorous attention to voter list maintenance was crucial to the NVRA's passage.

International Dictionary (1993). Contemporary dictionaries provide similar definitions of reasonable, as the Oxford English Dictionary's online dictionary defines reasonable as "[w]ithin the limits of what it would be rational or sensible to expect; not extravagant or excessive; moderate." *Reasonable*, Oxford English Dictionary, https://www.oed.com/dictionary/reasonable_adj?tab=meaning_and_use#26885710. Relatedly, contemporary dictionaries define "effort" as "a serious attempt : try." *Effort*, Merriam-Webster, https://www.merriam-webster.com/dictionary/effort.

In looking at these dictionary definitions, a fairly straightforward definition of "reasonable effort" can be constructed: a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality. This definition can then be placed in the broader context of § 8's dead registrant language. The statute states that a state must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant. " 52 U.S.C. § 20507(a)(4)(A). Thus, a state must establish a program that makes a rational and sensible attempt to remove dead registrants; a state need not, however, go to "extravagant or excessive" lengths in creating and maintaining such a program. This definition of the NVRA's language is drawn from the plain, ordinary meaning of the statute; accordingly, the Court's analysis ends there and "applies the statute as written." *Donovan*, 983 F.3d at 253. PILF is thus mistaken in relying on extratextual sources to guide its interpretation of § 8. The plain language of the statute, not legislative history or the Justice Department's actions, determine the law's meaning.

In addition, PILF's definition of "reasonable effort" is incongruent with the NVRA's common meaning. PILF states that a reasonable effort "to remove deceased registrants must amount to a quantifiable, objective standard that may be applied to all entities subject to the NVRA." Appellant Br., ECF No. 21, 17. To interpret the language of the NVRA as imposing a "quantifiable" target finds no support in § 8 and is not anchored to the common meaning of the statute. It is unclear what counts as "a quantifiable, objective standard," how a state could meet that standard, or how such a requirement could be derived from the plain language of the statute.

### b.  *Application of the Reasonable Effort Standard to Summary Judgment*

In its order, the district court found that undisputed evidence established that Michigan's program of removing deceased registrants fell squarely within the NVRA's reasonable-effort requirement.    The district court's order outlined several reasons to explain this conclusion.

First, the court turned to Eleventh Circuit case law.    In *Bellitto v. Snipes*, a nonprofit corporation filed suit against a county elections official in Florida who allegedly "failed to satisfy her list-maintenance obligations" under the NVRA.[8] 935 F.3d 1192, 1194 (11th Cir. 2019).   While the issues discussed in *Bellitto* are largely unconnected to the issues of this case, the Eleventh Circuit briefly touched on § 8's reasonable efforts standard.    Specifically, the court noted:

> As for voters who become ineligible because of death, we agree with the district court that a jurisdiction's reliance on reliable death records, such as state health department records and the Social Security Death Index, to identify and remove deceased voters constitutes a reasonable effort.  The state is not required to exhaust all available methods for identifying deceased voters; it need only use reasonably reliable information to identify and remove such voters.

*Id*. at 1205.    The district court highlighted that Michigan employs a similarly "reasonable" program.  Like Florida, Michigan "relies on [the Social Security Death Index] and state health records in order to identify and remove deceased registrants, in addition to other tools to capture both in-state and out-of-state deaths."   Summ. J. Order, R. 180, Page ID #3659.

Second, the district court turned to state-specific statistics demonstrating the reasonableness of Michigan's program.    In its October 5, 2020 Letter, PILF identified 27,000 "potentially deceased" voters on Michigan's registration rolls.   Oct. 2020 Letter, R. 1-6, Page ID #52–53.    The district court calculated that this figure "would comprise

---

[8]PILF argues that the district court's reliance on *Bellitto* was inapposite as that case had a different procedural posture and factual record.   Specifically, PILF states that *Bellitto* "was decided following a bench trial" and PILF relies on evidence that is qualitatively different from the evidence at issue in *Bellitto*.   Appellant's Br., ECF No. 21, 25.   Yet the portions of *Bellitto* that the district court cites to are either not particular to the procedural history, or constitute irrelevant evidence.   Instead, those portions cited by the district court consider broad interpretations of the NVRA's reasonable-effort standard—interpretations that are readily applicable to this case.

approximately 0.3 percent of the total number of [8.2 million] registered voters in Michigan." Summ. J. Order, R. 180, Page ID #3657.   This relatively small percentage, according to the district court, "would simply not be unreasonable in a state the size of Michigan"—especially considering that "federally collected data shows that Michigan is consistently among the most active states in the United States in cancelling the registrations of deceased individuals."   *Id.*

Third, the district court analyzed the mechanics of Michigan's program.   The court noted that Michigan undertakes a number of steps to ensure a well-functioning program, including: (1) comparing Social Security Administration death reports on a weekly basis to the CARS list; (2) reconciling the QVF with the CARS driver file on a quarterly basis; and (3) manually reviewing the bimonthly ERIC reports, which are created by comparing the QVF to the Social Security Death Index.   Under this program, the district court noted, "nearly 8,000 of the 'potentially deceased' voters identified by PILF in its October 5, 2020 list had already been removed" by September 2023, and 5,766 had been removed before PILF filed its action in November 2021.   *Id.* at Page ID #3658.   While PILF argued that it is not enough to merely schedule registrant removal under these procedures, and that the entire list of 27,000 deceased registrants "should be fixed now," Pl.'s Resp. Summ. J., R. 168, Page ID #3413, the district court disagreed.   The court found that the NVRA "does not require states to immediately remove every voter who may have become ineligible," and it was instead sufficient that the "record demonstrate[d] that deceased voters are removed from Michigan's voter rolls on a regular and ongoing basis."   Summ. J. Order, R. 180, Page ID #3658.

These factors ultimately led the district court to the conclusion that Michigan's program fell squarely within the NVRA's reasonable effort language.   That determination was correct.

Neither party disputes the factual record with respect to certain core elements of Michigan's registrant removal program.   Both parties agree that (1) the QVF is updated automatically when an exact death is reported on CARS and manually when a "close match" is reported on CARS, (2) the QVF is updated based on information from the Social Security Administration's death records, and (3) the MDOS updates voter registrations manually based on "potentially deceased" records from ERIC.   While PILF disputes whether these

components of Michigan's program are enough to be considered a reasonable effort, it does not contest whether Michigan does in fact utilize these tools.    With these elements of the program established as a factual matter, we must determine whether this program constitutes a reasonable effort under the NVRA.

While this Circuit has yet to opine on what efforts are enough to be considered reasonable, *Bellitto* is instructive.[9]    There, the Eleventh Circuit found that Florida's "reliance on reliable death records, such as state health department records and the Social Security Death Index, to identify and remove deceased voters constitutes a reasonable effort."    *Bellitto*, 935 F.3d at 1205.    This reading of the reasonable effort requirement falls squarely in line with the ordinary, common meaning of the statute's language.    A state that actively makes efforts to remove dead registrants based on state and federal death records is engaging in an inherently rational, sensible attempt at maintaining accurate voter registration lists.    Michigan not only undertakes the kind of effort described in *Bellitto*, but it also adopts additional standards as well.    The defendant in *Bellitto* "utilized reliable death records from the Florida Department of Health and the Social Security administration to identify and regularly remove deceased voters," *id.* at 1195, which parallels Michigan's regular QVF updates based on information from state records and the Social Security Administration.    Yet Michigan goes further by also actively employing a third party, ERIC, to assist in identifying deceased registrants.    This additional effort only further enhances the reasonableness of Michigan's efforts to maintain accurate voter rolls.

That Michigan makes a reasonable effort can also be demonstrated through basic statistical evidence that, again, PILF does not dispute.    As the district court notes, there are 8.2 million registered voters in Michigan.    Assuming, arguendo, that PILF's calculation of 27,000 deceased voters on the state's voter rolls is correct, this would only constitute "0.3 percent of the total number of registered voters in Michigan."    Summ. J. Order, R. 180, Page

---

[9]Given that the parties do not dispute key facts, PILF's attempt to distinguish *Bellitto* on the basis that it involved a bench trial falls flat.    And although the *Bellitto* panel applied clear error review to the district court's factual findings, not the de novo review we apply here, the *Bellitto* panel also applied de novo review to issues of statutory interpretation—such as the meaning of the NVRA's "reasonable effort" requirement. 935 F.3d at 1197–98.

ID #3657.   That vanishingly small percentage is in-and-of-itself indicative that Michigan has taken rational, sensible steps to maintain accurate voter rolls.

PILF argues that these efforts are not, in fact, sufficiently reasonable, and takes issue with a number of features within Michigan's processes.   For example, PILF states that the Social Security Administration's death files are not compared directly with the QVF, but rather the files contained in CARS.   PILF argues that a better—i.e., more reasonable— process would compare the Social Security Administration's death records directly with the QVF.   PILF also posits that Michigan could improve its program by (1) utilizing the entire Social Security Administration death index, not just updates to it; (2) looking specifically for individuals registered *after* their death; and (3) changing a state policy that stops processing deceased notices two weeks prior to elections.   Appellee's Br., ECF No. 35, 30–32.   In fact, much of PILF's brief is filled with examples of ways in which Michigan's program is suboptimal and in which the program could be improved.   Yet the language of the NVRA does not require a perfect effort, nor does it require the most optimal effort, nor does it even require a very good effort.   Instead, the NVRA only requires a *reasonable* effort.   As the Eleventh Circuit noted: "The state is not required to exhaust all available methods for identifying deceased voters." *Bellitto*, 935 F.3d at 1205.   And Michigan's multi-layered efforts are more than reasonable.

PILF also argues that the district court improperly granted summary judgment because a finding of reasonableness is "indivisible from a factual inquiry" and should be left to a jury. Appellant's Reply Br., ECF No. 38, 1–2.   Neither this Circuit nor its sister circuits have explored whether determining if a state's registrant removal program "makes a reasonable effort" is an inquiry of fact, law, or both.   Yet the undisputed material facts of this case demonstrate that the district court was drawing a legal conclusion at summary judgment.   The district court was presented with broad set of undisputed evidence outlining the operations and results of Michigan's registrant removal program.   With these uncontested facts, the district court looked to determine the precise contours and requirements of the NVRA's reasonable efforts wording.   This is a task of deciphering legislative language, which is inherently a legal inquiry.   *See CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 597 (6th Cir. 2015). Where, as here, a district court has wide-ranging, undisputed facts concerning a state's

registrant removal program, the court is well within its discretion to make a legal finding and grant summary judgment.

### 3.  Summary Judgment as to Count II

Count II of PILF's complaint alleges that Secretary Benson violated the NVRA's inspection of records and data provision by failing to produce records in response to the December 18, 2020 Letter.   Both parties moved for summary judgment on this count; the district court granted it in favor of Secretary Benson, finding that the claim was moot. Whether the district court erred in finding that the count was moot is a determination we need not reach.   Instead, Count II must be dismissed because PILF does not have standing to assert this claim.[10]

"For a dispute to qualify as an Article III case or controversy that a federal court may resolve, the plaintiff who brings the dispute to the court must have standing."   *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 389 (6th Cir. 2022) (cleaned up).   To demonstrate standing under Article III, "a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be 'fairly traceable' to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury."   *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)).   Courts "look only to 'the facts existing when the complaint is filed'" to determine standing.   *Barber*, 31 F.4th at 390 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992)).   To show injury, a plaintiff must allege that it "suffered an injury in fact, which is 'concrete, particularized, and actual or imminent.'" *Shearson v. Holder*, 725 F.3d 588, 592 (6th Cir. 2013) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).   A plaintiff may allege an "informational injury," but it must identify concrete "'downstream consequences' from failing to receive the required information." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (citation omitted).

---

[10]Secretary Benson raised the issue of standing at summary judgment; however, the district court declined to rule on the issue because the court dismissed the case on mootness grounds.

The Fifth Circuit's recent holding in *Campaign Legal Center v. Scott*, which presented very similar facts as this case, is instructive.   49 F.4th 931 (5th Cir. 2022).   There, the plaintiffs filed a request to the Texas Secretary State for documents relating to voter registrants identified by the state "as potential non-U.S. citizens."   *Id.* at 934.   The Texas Secretary of State refused to release the documents on privacy grounds.   In response, the plaintiffs filed suit under the same NVRA public disclosure provision at issue in this case, alleging that Texas had unlawfully failed to produce records as required by federal law.   On appeal, the Fifth Circuit reviewed whether the plaintiffs had standing to bring the case; specifically, whether the plaintiffs had sufficiently alleged an informational injury.   The plaintiffs provided three arguments as to why they had established injury: first, as "civic engagement organizations," they had "standing to request records under the NVRA;" second, "there is a downstream injury with respect to the public not having visibility into how Texas is keeping its voter lists;" and third, "there is a downstream injury with respect to the public not having visibility into properly registered Texans being discriminated against and burdened in their right to vote." *Id*. at 936 (cleaned up).

The Fifth Circuit rejected these arguments on multiple grounds.   First, the court pointed out that under the Supreme Court's *TransUnion* doctrine, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."   *Id.* (quoting *TransUnion*, 594 U.S. at 426).   In other words, it is not enough for a plaintiff to simply allege that it was unlawfully denied records requests; instead, a plaintiff must also show that some concrete downstream injury resulted.[11]   The court also emphasized the Supreme Court's

---

[11]The Fifth Circuit noted that the plaintiffs relied on "superficially appealing" Supreme Court case law prior to *TransUnion*.   *Id*. at 937.   That case law found that "government refusals to compel disclosures of information arguably required by law constituted a concrete Article III injury."   *Id.* at 938 (citing *FEC v. Akins*, 524 U.S. 11, 15–16 (1998); *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989)).   Yet the Fifth Circuit noted that those cases—which are the same cases that PILF cites to in this case—cannot be read out of context.   In reviewing the Supreme Court's *TransUnion* opinion in context with earlier cases, the Fifth Circuit correctly interpreted the Supreme Court's case law to hold that "even in public disclosure-based cases, plaintiffs must and can assert 'downstream consequences,' which is another way of identifying concrete harm from governmental failures to disclose."   *Id.* at 937–38; *accord Grae v. Corr. Corp. of Am.*, 57 F.4th 567, 570–71 (6th Cir.) (reconciling *Akins* and *Public Citizen* with *TransUnion* by noting that the former two cases, although public disclosure cases, nonetheless involved downstream harms that "transformed what otherwise would have been a 'bare procedural violation' of a public-disclosure law into a concrete injury"), *cert. denied sub nom. Tardy v. Corr. Corp. of Am.*, 144 S. Ct. 285 (2023).

warning that "Article III standing requires a concrete injury even in the context of a statutory violation."   *Id.* at 937 (quoting *TransUnion*, 594 U.S. at 426).   Second, the court found that the plaintiffs had not demonstrated "any downstream consequences from an alleged injury in law under the NVRA."   *Id.*   The plaintiffs' theories regarding "visibility" failed to establish a "cognizable injury in fact" as these were not examples of a "concrete and particularized harm." *Id.*   Third, the court emphasized that "[t]he lack of concrete harm . . . is reinforced because not a single Plaintiff is a Texas voter, much less a voter wrongfully identified as ineligible, and the Plaintiffs have not claimed organizational standing on behalf of any Texas voter members."   *Id.*  Finally, the court stated that the plaintiffs did "not allege that identification of voter names and identification numbers [would] directly lead to action relevant to the NVRA or any other statute, nor that their direct participation in the electoral process [would] be hindered."   *Id*. at 938.   Thus, the Fifth Circuit concluded that the plaintiffs had failed to establish an informational injury, as they had failed to demonstrate concrete downstream consequences from Texas' failure to produce the requested records.

*Campaign Legal Center* is directly analogous to this case.   Like the *Campaign Legal Center* plaintiffs, PILF sought voter records pursuant to the NVRA; and like the *Campaign Legal Center* plaintiffs, PILF is not a registered voter, nor has it claimed organizational standing on behalf of registered voters, in the voting jurisdiction at issue.[12]   PILF's legal argument also mirrors the *Campaign Legal Center* plaintiffs' argument in that PILF states that it suffered a cognizable injury under the informational injury doctrine.   PILF attempts to draw a distinction between this case and *Campaign Legal Center* with respect to "downstream consequences."   PILF argues that unlike the Fifth Circuit case, the complaint in this action directly references concrete downstream harms.   Specifically, PILF alleges in its complaint that Secretary Benson's failure to produce relevant records "prevents [PILF] from engaging in its research, educational, and remedial activities."   Compl., R. 1, Page ID #19.   In its reply brief, PILF further argues that Secretary Benson "has impaired the accumulation of institutional knowledge to assist and inform" PILF's "core functions" because such knowledge is

---

[12]PILF is not located in Michigan.   Instead, it is "incorporated and based in Indianapolis, Indiana." Compl., R. 1, Page ID #2.

"informed by [the] state's compliance with the NVRA."　Appellant Reply Br., ECF No. 38, 17.

PILF's downstream consequences argument is unavailing.　This stance is similar to one of the unsuccessful arguments made by the plaintiffs in *Campaign Legal Center*.　In its brief, the plaintiffs argued that Texas' failure to release records prevented the plaintiffs from achieving their organizational goal of "monitoring Texas's compliance with the NVRA" because the "refusal to produce records of the individuals identified under the list maintenance program" denied the plaintiffs "the opportunity to identify eligible voters improperly flagged by the program."　Appellee Br. at 35, *Campaign Legal Ctr. v. Scott*, No. 22-50692 (5th Cir. Aug. 24, 2022), ECF No. 60-1.　In effect, the plaintiffs argued that Texas' failure to produce documents broadly harmed the organizational goals of the plaintiffs—an argument very similar to the one made by PILF, and which the Fifth Circuit found unconvincing.　*See Campaign Legal Ctr.*, 49 F.4th at 937–38.

Furthermore, the allegation in PILF's complaint that Secretary Benson's actions prevent PILF "from engaging in its research, educational, and remedial activities" is, at most, a vague and unspecific injury.　*See Campaign Legal Ctr.*, 49 F.4th at 937 ("[T]he district court's concern about Plaintiffs' lack of 'opportunity' to identify voters incorrectly described by the Secretary's data base expresses a speculative rather than concrete grievance.　To support standing, however, Plaintiffs' injury must be more than speculative and must be 'certainly impending.'" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013))).　Neither the complaint nor PILF's briefs identify, for example, specific projects, research papers, or educational outreach efforts that were directly impacted by Secretary Benson's failure to produce relevant records.　This Circuit has cautioned that "'mere allegations' are insufficient to establish jurisdiction; at summary judgment, plaintiffs must set forth 'specific facts.'" *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) (quoting *Lujan*, 504 U.S. at 561) (finding that an election advocacy organization had failed to establish standing where it alleged only that a state's actions diverted the organization's "limited resources," and failed to identify "specific facts" to support this assertion); *see also Merck v. Walmart, Inc.*, 114 F.4th 762, 776 (6th Cir. 2024) (holding that a plaintiff "must point to *specific evidence* tending to prove

that he has an interest in using the withheld information . . . for some purpose beyond his statutory right to receive it" (emphasis added)); *Ctr. for Biological Diversity v. Lueckel*, 417 F.3d 532, 537 (6th Cir. 2005) ("Because the plaintiffs' standing was challenged in a motion for summary judgment, the plaintiffs must[] . . . 'set forth specific facts,' in affidavits or through other evidence, demonstrating that each element of standing is satisfied." (quoting Fed. R. Civ. P. 56(e) (2005) (amended 2007)).  Indeed, the Third Circuit recently considered nearly *identical* injuries claimed by PILF—including the inability to "study and analyze" list maintenance "to promote the integrity of elections," as well as the "inability to publish 'educational materials'"—and faulted PILF for "submit[ting] no evidence of any specific plans for the records it sought."  *Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.*, No. 23-1590, --- F.4th ----, 2025 WL 1242229, at *8–9  (3d Cir. Apr. 25, 2025).  The court concluded that PILF "failed to identify some *specific* adverse downstream consequence for its mission or future plans" and, therefore, lacked standing.  *Id.* at *10.  PILF faces the same deficiencies here as well.

The combination of analogous case law from the Fifth and Third Circuits and PILF's failure to articulate specific downstream consequences demonstrates that PILF has failed to show a sufficient injury to confer Article III standing.  Count II must therefore be dismissed.

### III.  CONCLUSION

Neither the district court nor the magistrate judge abused their discretion in the discovery determinations relevant to this appeal.  Nor did the district court err in its summary judgment determination.  Accordingly, we **AFFIRM** the district court in full.